## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

CITY NATIONAL BANK OF ROANOKE, VA., V. HUNDLEY ET ALS.

March 9, 1911.

1. BILLS AND NOTES—*Holder in Due Course—Defective Title—Fraud.*—Under the negotiable instruments act of this State, in order to invalidate the title of the holder in due course of a negotiable note endorsed in blank, on account of notice of any infirmity in the instrument or defect in the title of the person negotiating it, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith. In the case at bar, no such notice or knowledge was shown on the part of the holder, though there was such fraud between the original parties in the procurement of the note as would have invalidated it in the hands of the payee.

Error to a judgment of the Circuit Court of Henry county in a proceeding by motion for a judgment for money. Judgment for the defendants. Plaintiff assigns error.

*Reversed.*

The opinion states the case.

*S. G. Whittle, Jr.,* and *Scott, Altizer & Watts,* for the plaintiff in error.

*John W. Carter,* for the defendants in error.

KEITH, P., delivered the opinion of the court.

The City National Bank of Roanoke, Va., gave notice of a motion for judgment against H. B. Hundley; T. N. Bar-

bour and others upon a negotiable note drawn by them, payable to Bauhaud Brothers or order.   Upon the trial of the case there was a verdict and judgment for the defendants, which, upon motion of the plaintiff was set aside and a new trial awarded as to Hundley and Barbour.   Upon the second trial there was again a verdict and judgment for the defendants, to which a writ of error was awarded.

The case presented by the record is as follows:   It is conceded that as between the makers and the payees of the note in question there was fraud in its procurement which would defeat an action upon it as between the original parties.   The City National Bank claims, however, that it was a holder in due course for value and without notice of any fraud or infirmity in the note.   The circumstances attending its purchase by the City National Bank of Roanoke are given in the testimony of Taylor and Greer.

Taylor, who was a witness for the bank, says that one Jerry Bunting came to the bank with a stranger, whom he introduced as T. J. McChesney; that McChesney then showed him this note for $800, together with two others for the same amount, made by the same parties, payable two and three years from date, respectively, saying that he had purchased them from Bauhaud Brothers and that he wished to sell them and would take $1,750; that McChesney left the notes with him that he might make investigation with respect to the parties to the notes, and said that he would call again the next morning; that Taylor did not know McChesney, but that he knew Bunting who introduced him very well; and that McChesney's conduct was so fair that he had no suspicion whatever that anything was wrong.   After McChesney left the office, he wrote to Mr. Greer, cashier of the First National Bank of Martinsville, Va., describing the notes and asking for information concerning them; that he also went out of his office and made inquiry of several residents of Roanoke who had

formerly lived in Henry county, where the makers of the notes resided, as to their solvency; that the next morning about 9 o'clock he called up Mr. Greer over the 'phone, and asked him if he had received his letter; that in reply he said that the notes referred to were perfectly good, and Taylor asked if he desired to purchase them, and he said that he did not care to purchase them; and that at the time this conversation took place over the 'phone McChesney was in the bank. Taylor further states that his original purpose was to buy the notes on his own account, but that after talking with Judge Woods, the president of the bank, it was decided that the notes should be purchased on account of the bank; and thereupon he told Mr. Phelps, the cashier, to pay Mr. McChesney, and he paid him $750 in cash and a cashier's check for $1,000; that the money was paid to McChesney on the morning of September 3, immediately after the conversation with Greer over the 'phone. Taylor further says that nothing that was said by Greer led him to suspect that there was any defect in the notes; that his sole object in making inquiry was to ascertain the solvency of the makers, and that he would not have purchased them if he had had any reason to suspect that there was anything wrong with them. On the 7th of September he received a letter from Mr. Greer, which had been lost and could not be produced, in which Greer said: "Referring to the notes you wrote me about, while they are perfectly good, I am afraid that you will have some trouble in collecting them."

Greer says that in a conversation with Taylor over the 'phone in September, 1908, he told him that the notes were perfectly good, that any two or three of the signers were good for the amount, but that he did not wish to buy them at any price; that his impression was that he told Taylor that there were some irregularities about the notes and that he might have trouble in collecting them; they were

joint notes, and such notes often give trouble in collection because of the fact that some of the makers want you to wait for others to pay their proportion; that he would make further inquiries and write him in regard to them; that he did make further inquiries during the day, and wrote Taylor that evening that there were irregularities in the notes, and that he might have trouble in collecting them. "I think I told him over the 'phone that there were irregularities and he might have trouble in collecting the notes, but I may have this confused with my letter which I wrote him on that day. I knew that there were irregularities in these notes when I 'phoned Mr. Taylor."

After the testimony was closed the plaintiff demurred to the evidence, the defendants joined therein, and the jury rendered the following verdict:

"Upon the plaintiff's demurrer to the evidence, we, the jury, assess the plaintiff's damages at $800.00 with lawful interest thereon from December 11, 1907, until paid, subject to a credit of $132.00 as of December 11, 1907, and further credit of $106.50 as of this date, subject to the opinion of the court upon said demurrer."

And the circuit court gave judgment for the defendants, to which a writ of error was awarded.

In *Frank & Adler* v. *Lilienfeld*, 33 Gratt. 377, Judge Burks speaking for this court says: "To invalidate the title of the holder of a negotiable instrument, endorsed in blank, acquired in due course of trade, and before maturity, it is not sufficient to show circumstances in the acquisition of the note affecting the holder with mere suspicion, or that he was guilty of gross negligence; but it is necessary to show that he was guilty of fraud."

Such was the established law of this State at the time the negotiable instruments act was adopted, which is in this respect merely declaratory of the law as it existed at the time of its passage. That act provides that a holder

in due course is one who has taken a note which is complete and regular upon its face, before it was overdue and without notice that it had been previously dishonored, if such was the fact; that he took it in good faith and for value; and at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it.

Clause 56 of section 2841-a of the Code provides, that "To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect or knowledge of such facts that his action in taking the instrument amounted to bad faith."

In this case the note was acquired before it was due, for value. The purchaser having no reason to suspect any infirmity in the note made inquiry as to the solvency of the makers, and it will be observed that while Greer says, that he has the impression that in his telephone conversation with Taylor, "I told him that there were irregularities and he might have trouble in collecting the notes," he also says, "but I may have confused this with my letter which I wrote him on that day," and refers to the fact that they were joint notes and that such notes often give trouble because of the fact that some of the makers want you to wait for others to pay their proportion, and that he would make further inquiries and write in regard to them. Taylor, ascertaining that the makers of the notes were solvent, and being willing to suffer any inconvenience that might result from the fact that the makers were numerous, purchased the notes and paid the consideration before receiving a letter from Greer, which did not reach him until September 7, four days after the transaction was completed. We attach no importance to the fact that there were certain small credits upon the notes and that McChesney was not required to endorse them.

These facts fall far short of establishing fraud or bad faith in the acquisition of the notes.

We are, therefore, of opinion that the judgment of the circuit court must be reversed, and this court will enter such judgment as the circuit court should have rendered.

*Reversed.*