## Richmond.

## DUNCAN V. BROADWAY NATIONAL BANK.

### March 18, 1920.

1. CONTINUANCES—*Absence of Witnesses—Further Continuance.*—A case had been regularly called on the docket of the court at the April term, 1918, and continued to the June term. At the June term it was again called, and passed to July 8th, and then finally set for July 15th, when it was tried. These delays were in the interest of defendant.

   *Held:* That the court might properly refuse a further continuance to defendant on account of the absence of witnesses, where the witnesses had been summond but the summonses had been returned unexecuted, and the affidavits of counsel did not give any reasons for the belief of counsel as to the materiality of the witnesses, or as to the probability of securing their testimony, at a subsequent trial; and the oral testimony of counsel did not substantially alter the situation in these respects.

2. CONTINUANCES—*Discretion of Court.*—The granting or refusal of a continuance on the ground of the absence of witnesses is within the discretion of the trial court.

3. CONTINUANCES—*Absence of Witnesses—Examination of Counsel as to what Witnesses are Expected to Prove.*—Where a continuance is asked for on the ground of the absence of material witnesses and is supported by affidavits of counsel, it is not error for the trial court to require counsel who made the affidavits to go on the witness stand and testify as to what they expected to prove by the absent witnesses.

4. CONTINUANCES—*Absence of Witnesses—Mere Surmise as to What Witnesses Would Testify.*—Counsel cannot reasonably ask the trial court to continue a case, upon the ground that material witnesses were absent, upon a mere surmise as to what such witnesses would prove.

5. APPEAL AND ERROR—*Harmless Error—Inspection of Books in Evidence.*—The president of plaintiff bank was in court with certain books and papers pursuant to a summons issued against him. Before announcing ready for trial, defendant moved the court to require the plaintiff to allow him to inspect these

books and papers before putting them in evidence. The plaintiff objected and the court sustained the objection.

*Held:* That the question became moot and immaterial, in view of the fact that counsel did subsequently introduce the witness who had custody of the books and papers which were produced, the witness fully examined with reference to them, the defendant getting the benefit of everything material which they contained.

6. ORDER OF PROOF—*Case at Bar.*—Defendant had summoned as witnesses so many of the officers of plaintiff bank that it would probably have been necessary to close the bank if all of them had attended the trial at the same time. Three of these officers were in attendance upon the court, and three others were keeping the bank open. The court, on motion of the plaintiff, properly held that if the defendant expected to use the bank officers then in attendance, they must do so at that time, so as to allow them to return to the bank and relieve the other bank officers then under summons.

7. ORDER OF PROOF—*General Rule.*—The general rule is that the order of proof should be left to the preference and judgment of counsel, but a due and efficient administrative control of proceedings in court requires that the trial judge shall have a wide discretion in all matters of this kind.

8. BILLS, NOTES AND CHECKS—*Defenses—Notes Given for Stock.— Agreement to Resell Stock—Case at Bar.*—Defendant gave three notes in payment for stock in a certain corporation. The seller of the stock agreed to resell the stock for defendant at a profit within twelve months, if the defendant should so desire. The notes were then sold to plaintiff bank at a discount, payment being made by a six months' certificate of deposit. In an action by the bank on the notes, defendant set up as defenses, (a) failure of consideration; (b) fraud in procurement; (c) that plaintiff was not a *bona fide* holder for value and in due course; and (d) that the action was premature, because one of the defenses had not matured.

*Held:* That none of the defenses relied upon was well founded. Defendant got exactly what he contracted for, stock in the corporation, and a contract to resell. The time for the performance of the contract to resell had not arrived when the instant case was tried, and so far as the record shows, defendant had never made any effort to ascertain the value or availability of the contract up to the time at which the bank paid the certificate of deposit given as consideration for the notes.

9. BILLS, NOTES AND CHECKS—*Defenses—Notes Given for Stock—*

*Agreement to Resell Stock—Case at Bar.*—But, if any of the defenses enumerated in the preceding syllabus would have been good as between defendant and the seller of the stock, they were cut off by the fact that the bank was clearly and plainly a *bona fide* holder of the notes in due course and for value.

10. BILLS, NOTES AND. CHECKS—*Defenses—Section 5616 of the Code of 1919.*—In an action by a bank, the holder of certain notes, against the maker thereof, where the bank had purchased the notes, paying for them with a certificate of deposit maturing in six months, the bank is entitled to recover, notwithstanding section 5616, of the Code of 1919, where nothing transpired. prior to the maturity and payment of the certificate of deposit to give notice to the bank of an alleged infirmity in the consideration for the notes.

Error to a judgment of the Circuit Court of Culpeper county, in a proceeding by motion for a judgment for money. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Hiden & Bickers* and *S. M. Nottingham,* for the plaintiff in error.

*F. T. Sutton, Jr.,* for the defendant in error.

KELLY, P., delivered the opinion of the court.

The Broadway National Bank of Richmond, being the holder of three negotiable notes executed by E. P. Duncan to his own order and endorsed by him, obtained a judgment thereon against Duncan, which is now under review.

[1, 2]   1. The refusal of the trial court to grant the defendant a continuance because of the absence of three witnesses, Arrington, Evans and Smith, is assigned as error. Arrington and Smith were non-residents; Evans was "sup-

posed to be" in the United States Army, but his where-abouts were unknown.   A summons had been issued for these witnesses a short time before the trial and returned unexecuted.   There was also an unexecuted *subpoena duces tecum,* requiring Smith to produce certain books and papers. The case had been regularly called on the docket of the court at the April term, 1918, and continued to the June term. At the June term it was again called and passed to July 8th and then finally set for July 15th, when it was tried. These successive delays appear to have been chiefly in the interest of the defendant, the plaintiff being ready at the April term and at all times thereafter.   The bill of excep-tions shows that the motion for continuance was in the first instance supported by the affidavits of counsel, who, upon being required by the court to submit to examination as to what they expected to prove by the absent witnesses and the books and papers called for in the *subpoena duces tecum,* "showed that the statements in the affidavits were based upon belief and not upon actual knowledge, and that neither of the affiants knew the witnesses personally, had never talked with them, and had no actual knowledge of what they would say, nor what the books, papers, etc., * * * contained."

The affidavits did not give any reasons for the belief of counsel as to the materiality of the witnesses, or as to the probability of securing their testimony at a subsequent trial; and the oral testimony of counsel did not substantially alter the situation in these respects.   It would have been a pure experiment, based upon conjecture, if the court had granted the continuance, and its action in refusing the same was a proper exercise of the well known discretion which, under a wise rule of practice, belongs to the trial court.

[3, 4]   Nor do we find that the court erred, as alleged, in requiring counsel who had made the affidavits above men-tioned to go on the witness stand and testify as to what they

expected to prove by the absent witnesses. The gravamen of this assignment seems to be that the action complained of was taken by the court, not on its own motion, but on motion of counsel for plaintiff. What the court would have done in the absence of a motion by counsel may be left to conjecture, although its probable action on its own motion under such circumstances would perhaps be easy to forecast. What it actually did, disclosed that counsel for defendant were laboring under the mistaken idea that they could reasonably ask the court to continue the case upon a mere surmise as to what they could prove by Arrington, Evans and Smith, and by the books and papers in question. See *Hewitt's Case,* 17 Gratt. (58 Va.) 627; *Harman* v. *Howe,* 27 Gratt. (68 Va.) 686; Burks' Pl. & Pr. 465. From these authorities it will clearly appear that the court did not err in requiring the affiants to disclose the facts which they expected to prove by the absent witnesses and the reasons upon which their expectation in this respect was based. The record before us contains a voluminous stenographic report of all that transpired with reference to the strenuous efforts of the defendant to continue the case, and this report shows that the trial judge was exceedingly patient, cautious and considerate, and only ruled against the motion for a continuance after the fullest hearing.

[5] 2. The president of the plaintiff bank was in court with certain books and papers pursuant to a summons issued against him in accordance with section 3371 of the Code of 1904 (Code, 1919; sec. 6237), which had been served upon him at the instance of the defendant. Before announcing ready for trial, the defendant moved the court to require the plaintiff to allow him to inspect these books and papers before putting them in evidence. The plaintiff objected, the court sustained the objection, and the defendant excepted and assigns error. The question, however, becomes moot and immaterial in view of the fact that coun-

sel did subsequently introduce the witness who had custody of the books and papers, the same were produced, the witness fully examined with reference to them, and the defendant got the benefit of everything material which they contained.

[6, 7]  3. It is assigned as error that "the court permitted counsel for plaintiff to dictate the order in which" the defendant should introduce his witnesses.  The record discloses a state of facts in which the court, although apparently following the suggestion of counsel for plaintiff, ought to have, and undoubtedly would have taken exactly the same course on its own motion.  The situation was this: A summons had been served on Clyde W. Saunders to testify on behalf of the defendant.  He was not present but was in Richmond, ninety miles from Culpeper where the trial was being held, and had explained to the court that he was engaged in important work for the United States Army Draft Board, and would be unable to reach the place of trial for two days.  The court had also been informed of the substance of the testimony which Saunders was expected to give, and it was of such character as that the order of its introduction could not have been material.  The defendant had summoned as witnesses a number of the officers of the plaintiff bank—so many in fact that it would probably have been necessary to close the bank if all of them had attended the trial at one time.  Three of these officers were in attendance upon the court; three others were in Richmond attending to the important public duty of keeping the bank open, but were ready to come as soon as they could be relieved by the return of those already at court.  Counsel for defendant insisted upon using Saunders as their first witness, and moved for a postponement until his presence could be procured.  The court, on motion of the plaintiff, very properly held that if the defendant expected to use the bank officers then in attendance, they

must do so at that time so as to allow them to return to Richmond and relieve the other bank officers then under summons. Counsel for defendant stated that under these circumstances they did not care to examine the bank witnesses at all, but would simply save the point.. Later on, however, they did call to the stand all three of the bank officers who were present, to-wit; H. N. Phillips, president; F. L. McConnell, vice-president and cashier, and A. M. Smith, vice-president, and examined them fully along with the books and papers for which they had called in the summons above mentioned. Counsel for plaintiff and defendant then· agreed upon what the testimony of Clyde Saunders would be if he were present, and he was´ not required to come to the trial at all.

In view of the foregoing facts, there would seem no room for doubt as to the correctness of the ruling of the court. The general rule is that the order of proof should be left to the preference and judgment of counsel; but a due and efficient administrative control of proceedings in court requires that the trial judge shall have a wide discretion in all matters of this kind. That he does have such discretion is perfectly well settled by the authorities. The Virginia cases on the subject are numerous. No one of them perhaps is exactly like this one in its facts, but the reason and principle of all of them is the same. As applied to this case, the rule is very well stated in the language used by Judge·Keith in *Wickham* v. *Leftwich,* 112 Va. 225, 228, 70 S. E. 503, 504, as follows: "We have frequently held that the trial court has a large discretion with respect to the order in which testimony is to be admitted before it, and, while we have never held that this court will in no case undertake to control that discretion, we do not find in the record before us any occasion to depart from the practice usual in such cases. This ground of error is therefore overruled."

[8]    4. We come now to the merits of the controversy. The plaintiff, having introduced in evidence the three notes sued on, rested its case. The defendant then produced his evidence, and the plaintiff demurred thereto. The court sustained the demurrer, awarding judgment for the plaintiff, and the defendant excepted.

The execution, delivery, and negotiation of the notes were not denied. The defenses stated were, (a) failure of consideration; (b) fraud in procurement; (c) that the plaintiff was not a *bona fide* holder for value and in due course; and (d) that the action was premature because one of the defenses had not matured (meaning a defense under the contract for resale).

The evidence, regarded from the standpoint of a demurrer thereto by the plaintiff, discloses the following material facts: Duncan was a man of means and business experience. He was a farmer and cattle dealer, residing on his own farm near the town of Culpeper, and he had also been for a number of years a director in one of the Culpeper banks. In August, 1917, he was solicited by W. H. Arrington, secretary and treasurer of the Washington-District of Columbia Taka-Kola Bottling Corporation, to take stock in that corporation. Arrington was accompanied by E. V. Evans, a sales agent of the company, but Arrington seems to have conducted the negotiations. There is some contention that Duncan understood Arrington as offering stock in another company, to-wit: the "Taka-Kola Company," but no substantial foundation exists for any such contention. Duncan does say once or twice in his testimony that Arrington solicited him to take stock in the "Taka-Kola Company," but he could not have failed to understand that this was merely an abbreviation for the full name of the corporation with which he was dealing. Nowhere in the record is there any evidence to show that the Taka-Kola Company had any existence as a separate corporation, or

that if there was such a separate corporation, it was any better or more solvent than the one represented by Arrington.

Duncan at first declined to take the stock on the ground that he had no money with which to pay for it, and thereupon Arrington said: "If you will take this stock, I will sell the stock for you again, and we will divide the profits on it." This offer appealed to Duncan, and as a result he executed and delivered to Arrington the three notes sued on in this case, and Arrington gave him a written agreement for the resale of the stock. It appears that there were two sales by Arrington to Duncan, the first on August 19, 1917, for fifty shares, for which Duncan delivered to Arrington his note for $500, payable to his own order and endorsed by him, due six months after date, with interest, and the second on August 22, 1917, for five hundred shares, for which Duncan delivered to Arrington his two notes in like form for $2500 each, due six months after date, with interest. In return for these notes Duncan received and had in his possession at the time this suit was brought the following papers: (1) Receipt for $500, dated August 19, 1917, "in full payment for 50 shares of the capital stock of the Washington-District of Columbia Taka-Kola Bottling Corporation of Richmond, Va., pursuant to the application therefor bearing the same number and date as this receipt and referred to and made a part hereof." (2) A like receipt dated August 22, 1917, for $5,000, covering the payment for 500 shares of the stock. (3) A certificate for 550 shares of the capital stock of the Washington-District of Columbia Taka-Kola Bottling Corporation. (4) An agreement dated August 22, 1917, signed by W. H. Arrington, sec'y. & treas., in the following words and figures: "In the event E. P. Duncan desires to dispose of his stock ($5,000.00 in this corporation, Washington-District of Columbia Taka-Kola Bot. Corp.) after twelve

months from date, I agree to resell same for as much as twelve dollars and fifty cents (12.50) per share or better, and all over the par ten dollars ($10.00) to be equally divided between he and myself."

In testifying in regard to this last mentioned agreement, Duncan was asked by his counsel the following question, and gave the following answer: "Please state, Mr. Duncan, if that was the inducement which made you sign these notes." Answer: "That was the only inducement. That was the reason I took them for I had told him a thousand times that I did not want any stock in the Taka-Kola Company." The foregoing answer, as well as the papers which were exchanged at the time between Duncan and Arrington, and indeed everything in the record bearing upon the question show most convincingly that Duncan not only could not have been left in any doubt as to the name of the corporation in which he was to have stock, but also that he was influenced only by the agreement of Arrington to resell the stock at a profit.

A day or two later, Arrington disposed of the notes to the plaintiff, Broadway National Bank of Richmond. The negotiations on the part of the bank were conducted by H. N. Phillips, president, who, in the course of his examination by counsel for the defendant, said: "Mr. Arrington was not a stranger. But had he been a stranger up to that time, he came to me with a letter from a most esteemed citizen of Culpeper county and town which would have given him a most respectful hearing." The letter here referred to was dated August 23, 1917, and was from John J. Davies, cashier of the Culpeper National Bank, addressed to W. H. Arrington, and to the following effect:

"We regret that we cannot use the three notes of E. P. Duncan, aggregating $5,500.00. We would be glad to do so if we were not now carrying Mr. Duncan's paper to our limit. We regard the notes genuine, good and collect-

able. Dr. Duncan owns considerable real and personal property, being worth at least $150,000.00. Regretting our inability to use this paper, we are, etc."

Before concluding the transaction, the plaintiff bank addressed inquiries to the Second National Bank of Culpeper, and to the Culpeper National Bank (both doing business at the home of the defendant), and received from them, in the order here named the following telegraphic replies: (1) "E. P. Duncan, fifty-five hundred, I consider good. Seems to be investing too freely." (2) E. P. Duncan note, fifty-five hundred, good, collectable."

Thereupon the bank purchased the notes. It was Arrington's own proposition, accepted by the bank, to sell them at a discount of 5%, and to accept in payment a six months' certificate of deposit for the face of the notes, less the discount. In this way the bank realized a discount of 5%, and in addition thereto the 6% interest which the notes provided for, and also got the benefit of the use of the money represented by the time deposit, upon which, however, it had to pay 3% interest. The bank officers testified that while the time deposit made the purchase more attractive, the deposit itself was in no way taken or held as security for the notes. Upon the contrary, the certificate of deposit was a negotiable instrument, and as soon as it was delivered to Arrington was in such form as that he could have disposed of it and put the proceeds entirely beyond the control of the bank, except as to the time of payment. When it matured on February 27, 1918, it was paid in due course through the clearing house upon the joint endorsement of Arrington and the Washington-District of Columbia Taka-Kola Bottling Corporation.

None of the defenses relied upon are, in our opinion, well founded. Duncan got exactly what he contracted for, the stock in the Washington-District of Columbia Taka-Kola Bottling Corporation, and a contract to resell. The time

for the performance of the latter contract had not arrived when this case was tried.    So far as the record shows, Duncan himself had never made any effort to ascertain the value or availability of that contract up to February 27, 1918, the date on which the bank made the certificate of deposit.

[9]    But if any of the defenses claimed would have been good as between Duncan and the corporation, they were cut off by the fact that the bank was clearly and plainly a *bona fide* holder of the notes in due course and for value. The evidence, as stated above, contains a fair recital of what transpired between Arrington and the bank, and of the caution with which the bank proceeded before it purchased the paper.

[10]    We are referred to sundry authorities for the general proposition found in section 5616 of the Code, being a part of our negotiable instrument law, as follows: "Where a transferee receives notice of any infirmity in the instrument or defect in the title of the person negotiating the same before he has paid the full amount agreed to be paid therefor, he will be deemed a holder in due course only to the extent of the amount theretofore paid by him." If it were conceded that delivery of the certificate of deposit at the time the transfer was made did not amount to a payment in full, the position of the defendant is not improved, because the plaintiff did not have notice of any alleged infirmity in the notes until after the certificate of deposit itself was paid.    On January 25, 1918, Duncan wrote the bank as follows: "Your letter received reference to some notes of mine which I have a contract with the agent when I gave the notes that they were to sell the stock for me so I could get the money to meet the notes and they have not done it, and I have not nor will I have the money soon unless something turns up not expected."    To this letter the bank replied that when it bought the notes

it was assured that they would be promptly met, and that it would have to insist on payment, and Duncan answered: "Your letter received and I am sorry I cannot comply and don't see how anyone could tell that, but one could not expect any more from them if they were the same persons whom I gave them to, they have told and promised me that they would resell the stock for me at a profit to meet these notes. I have not the money nor will I have it for quite a while unless I sell something. I have the stock that those notes was given for, that I would exchange for the notes if you can handle it." On February 21st, the notes being then about due, the plaintiff sent the same to the Culpeper National Bank for collection, and the reply of that bank to the plaintiff, which was introduced in evidence without objection, stated: "Mr. Duncan says he will arrange to pay these notes in about ten days." The certificate of deposit was presented for payment through a clearing house and paid on the 27th of February, and at that time nothing had transpired to indicate anything more than that Mr. Duncan regretted his trade with Arrington.

We have held more than once that those who execute commercial paper and set it afloat are chargeable with greater care and diligence than those who purchase it in the regular course of business. The defendant, a man of affairs and a bank director for ten years or more, can hardly be heard to ask for a relaxation of this rule, especially in view of the fact that the notes he gave were in conspicuously and punctiliously negotiable form, and that, further, the reason for splitting the payment for the $5,000 subscription into two notes of $2,500 each must have been to facilitate their negotiation. The case falls within the doctrine of *Bank* v. *Hundley*, 112 Va. 51, 70 S. E. 494, and *Fleshman* v. *Bibb*, 118 Va. 582, 88 S. E. 64.

The judgment is affirmed.

*Affirmed.*