# Wytheville

## WARNER MOORE V. POTOMAC SAVINGS BANK OF WASHINGTON, D. C.

June 15, 1933.

Present, Holt, Epes, Hudgins, Gregory, Browning and Chinn, JJ.

598

The opinion states the case.

*Scott, Lloyd & Scott* and *R. H. McNeill,* for the plaintiff in error.

*Duval & Duval,* for the defendant in error.

HUDGINS, J., delivered the opinion of the court.

This action was instituted against Warner Moore, defendant below, to recover $6,000 on three negotiable notes for $2,000, each, dated November 29, 1930, payable six months after date, with six per cent interest, to the order of the maker and by him signed and indorsed. From an adverse judgment and verdict Moore obtained this writ of error.

The material facts appear to be that on November 28, 1930, at the Powhatan Hotel in Washington, D. C., one A. T. Herd, who at that time owed Moore $30,000, represented to him that he was negotiating with the Commissioner of Banks in the State of Minnesota to purchase at a profit of some $600,000 all the assets of a certain bank and trust company of that State which was then in process of liquidation; that he had secured all the money necessary to complete the transaction except $30,000; that if Moore would advance this sum, or give him notes to be discounted and the proceeds so used, he would close the deal and would deliver to Moore $100,000 in first mortgage bonds on real estate, assign him a personal claim Herd held against one A. L. Houser for $100,000, to be held as security for payment of the old debt of $30,000, the $30,000 then advanced, and the promised profit to Moore of $10,000.

Relying upon these representations and promises, Moore

executed fifteen notes totalling $30,000 and delivered them to Herd. On December 5, 1930, Herd took three of the notes in question to his attorney, C. C. Calhoun, to whom he owed a fee for representing him in the courts of the District of Columbia, and requested him to sell the notes, deduct from the proceeds his fee and pay Herd the balance. Calhoun, a customer of the Potomac Savings Bank, went with Herd to its banking house in Washington and there introduced him to Mr. Bowles, an active officer of the bank. Calhoun requested that the bank discount the notes for him, representing that the maker was a responsible and well-known business man of Richmond, Virginia. Bowles examined his books to ascertain the balance which Calhoun then had on deposit and made inquiry concerning the financial standing of Warner Moore. He was informed by reliable parties that Moore was rated as a millionaire, but found that Calhoun at that time carried in the bank a balance of only $16.08. Bowles thereupon informed Calhoun that the financial standing of the maker was satisfactory but that his balance did not justify the bank in discounting the notes for him. After some further discussion, it was agreed that the bank would purchase the notes at a discount of ten per cent from their face value. Thereupon Calhoun indorsed the notes in blank and accepted a check for $5,400, which he deposited to his credit in this bank, and at the same time gave A. T. Herd a check for $3,000 against the deposit.

The evidence discloses that the representations made by Herd to Moore were wholly false and fraudulent; that he had no deal pending with the Commissioner of Banks of Minnesota which resulted in either a purchase or an agreement to purchase any asset of any bank in that State.

Some thirty days before the notes were due, the Potomac Savings Bank notified Moore that it was the holder of the three notes and expected them to be paid at maturity. Promptly on receipt of this letter, i. e., April 30, 1931, Moore wrote the bank that the notes had been obtained from

him by false representation and that payment would be resisted. On the next day, May first, he again wrote the bank that he gave the notes for the purchase of a mortgage, which he was informed would probably be paid in three months, but that if it had not been paid at the time of maturity of these notes he was assured they would be renewed and Herd would pay them. Herd lived in New Hope, Pennsylvania, but after this transaction with Moore he seems to have disappeared and no one connected with these proceedings was able to locate him. Later this action was instituted, with the result above noted.

Upon the pleadings and the evidence, the issue presented was whether plaintiff was a holder in due course of the notes in question. It was conceded that Herd obtained the notes by misrepresentation and that his title thereto was defective. Upon this concession, of course the burden shifted to the plaintiff to show that it was a holder in due course, within the meaning of the Negotiable Instruments Law (Code 1919, sections 5614-5621).

The substance of defendant's six assignments of error revolves around two contentions. (1) That the transfer of the notes by Calhoun to the bank was illegal because the bank purchased or discounted them at an usurious rate of interest. (2) That the circumstances under which the bank acquired the notes were such that it was its duty to make inquiry of the maker before accepting them, which inquiry would have disclosed the defect in title.

The effect of usury at the inception of a negotiable instrument, in the hands of a holder in due course, depends upon the statutes in force in the different jurisdictions. Where the statute declares such a contract void the sale or transfer of the paper from one party to another gives it no vitality. See Joyce's Defenses to Commercial Paper, vol. 1, section 468, and cases there cited.

The Virginia statute, however, does not declare usurious contracts void, but declares all interest illegal and permits the lender to recover his principal. See Code, sec-

tion 5552. Under this section it was held in *Lynchburg National Bank* v. *Scott Brothers,* 91 Va. 652, 22 S. E. 487, 29 L. R. A. 827, 50 Am. St. Rep. 860, that a holder in due course could recover the full amount, notwithstanding that at inception the contract was tainted with usury. The usury charged here arose, if at all, at the time plaintiff acquired the notes. It is conceded that the laws of the District of Columbia control the transaction. The only act of Congress regulating interest and prescribing a penalty for imposing usurious interest charges in the District of Columbia, to which our attention has been called, is section 3, title 17, Interest and Usury, District of Columbia Code, as follows:

"If any person or corporation shall contract in the District, verbally, to pay a greater rate of interest than six per centum per annum, or shall contract in writing, to pay a greater rate than eight per centum per annum, the creditor shall forfeit the whole of the interest so contracted to be received."

It seems clear that Congress has not declared usurious contracts void in such cases, but permits the lender to recover only the principal. While the language in the section quoted is different from the Virginia statute, the result is the same. It follows, therefore, that even if plaintiff acquired the notes at an usurious rate of interest it would be entitled to recover from the immediate party the amount paid, without interest.

Defendant states his contention thus: "That the transaction as a result of which the bank got possession of the notes sued on was an illegal one under the laws of the District of Columbia, and therefore the plaintiff, a guilty party to the transaction, cannot maintain a suit in this State to secure the rewards of that unlawful transaction."

Numerous cases are cited to support the principle that in any action in which it is necessary to prove the illegal contract to maintain the action, courts will not enforce it, nor will they enforce any alleged rights directly

springing from such contract. With this principle we are in accord, and it applies in those jurisdictions in which the statute makes usurious contracts void. See *Sabine* v. *Paine,* 223 N. Y. 401, 119 N. E. 849, 5 A. L. R. 1444. The usury laws, in many of the States, were taken from the early English statutes. Prior to 1872 these same provisions, which rendered usurious contracts void as to both principal and interest, were contained in the Virginia statute. See *Munford* v. *McVeigh's Adm'r,* 92 Va. 446, 23 S. E. 857.

Where the statute simply declares that such contracts are illegal only as to the interest, permitting the lender to recover the principal amount loaned, as is the case in Virginia and the District of Columbia, such contracts are not void, and this is true whether the bill is tainted with usury at either its inception or in the hands of an indorsee.

In *Farmers', etc., Nat. Bank* v. *Dearing,* 91 U. S. 29, 35, 23 L. Ed. 196, this is said:

"Where a statute prescribes a rate of interest, and simply forbids the taking of more, and more is contracted for, the contract is good for what might be lawfully taken, and void only as to the excess. *Burnhisel* v. *Firman, Assignee,* 22 Wall. 170 [22 L. Ed. 766]; *German* v. *Calvert,* 12 Serg. & R. 46."

The same contention here made was considered and discussed by the Supreme Court of the United States (whose decisions are controlling in this case) in *Oates* v. *First Nat. Bank,* 100 U. S. 239, 249, 25 L. Ed. 580. It seems that Oates executed his note to Micow, who, before maturity, transferred it to the First National Bank of Montgomery, Alabama, as collateral to secure the payment of a large debt which Micow then owed it. The bank in accepting Oates' note as collateral and extending the time of payment of Micow's debt charged usurious interest. As between Oates and Micow, Oates had a complete defense. The Supreme Court of Alabama (*Saltmarsh* v. *Tuthill,* 13 Ala. 390, 410), in construing the usury statutes of that State, had held that one "who has become the indorsee of a bill, by violating the

provisions of a statute, cannot with any degree of propriety be said to be a *bona fide* holder in the usual course of trade." The court stated that it was not bound by the decisions of State courts upon questions of general commercial law when applied to national banks, and in concluding its opinion, Mr. Justice Harlan said:

"We have already seen that the transfer of the note before maturity, as collateral security, and so indorsed that the bank became a party to the instrument under obligation to make due presentment and give due notice of nonpayment, was itself a sufficient consideration to constitute the bank a *bona fide* holder for value, within the recognized principles of the law merchant. The presence then, in the contract under which the note was indorsed and delivered to the bank of an additional consideration—the payment in advance of usurious interest—which the law declares to be vicious and illegal, ought not to destroy the entire contract of indorsement, when there is a sufficient consideration, aside from the usury paid, upon which it may rest."

So here plaintiff is not charged with knowledge of defect in title to the notes in question because it discounted them at a greater rate of interest than that allowed lenders in the District of Columbia. This conclusion is in harmony with our own decisions. See *Fischer* v. *Lee*, 98 Va. 159, 35 S. E. 441.

In the foregoing discussion we have assumed (1) that the transaction between plaintiff and Calhoun was a loan and not a purchase; (2) that defendant, who was not a party to that transaction, was entitled to set up usury as a defense. The defendant in the trial court did not shape his pleadings, his instructions, or his exceptions to the rulings so as to limit the amount of plaintiff's recovery, nor is any such defense presented to this court. The trial court held that the transfer of the notes under the circumstances related, constituted a sale. Even if we hold that the transfer was not a sale, but a loan from the bank to Calhoun, the result would not bar plaintiff from recovering $5,400, the amount

paid Calhoun. But inasmuch as this question is not raised, it is useless to pursue the question further than to cite the following from Williston on Contracts, vol. 3, page 2968:

"If it be granted that the transaction is in effect a loan, the consequences of its being usurious will depend upon the statute locally in force. Under the early English statute the indorsement was held void so that not only no recovery against the indorser could be had, but none against the maker. But in most jurisdictions of the United States, even though the accuracy of the reasoning be conceded, the penalty for usury is not such as totally to invalidate the indorsement, and the indorsee may recover from the maker."

See, also, *People's Bank & Trust Co.* v. *Fenwick Sanitarium,* 120 La. 723, 58 So. 523, and note, 43 L. R. A. (N. S.) 211.

Defendant's other contention is that the circumstances under which the bank acquired the notes were such that it was the duty of the bank to make inquiry of the maker before accepting them, or, rather, that the question should have been submitted to the jury. The good faith of plaintiff in acquiring the notes was submitted to the jury in two instructions, given at its request. The defendant objected to these instructions upon general grounds; the court refused an instruction offered by defendant containing the same principle, and in addition, by implication at least, left the jury to find whether or not plaintiff was guilty of negligence in not making inquiry of the maker before accepting the notes.

The test of whether or not plaintiff was negligent when he acquired the instrument, was for a time the rule in England. See *Gill* v. *Cubitt,* 3 Barn. & Cress. 466, and *Slater* v. *West,* 3 Carr & Payne 325, which overruled *Lawson* v. *Webster,* 4 Esp. 56 (1801), wherein Lord Kenyon had held that suspicious circumstances, in the absence of actual fraud, was not sufficient to defeat recovery on a negotiable instrument in the hands of a *bona fide* holder for value. The doctrine announced in *Gill* v. *Cubitt,* and like cases, was in turn

overruled in *Backhouse* v. *Harrison,* 5 B. & Ad. 1098, and *Goodman* v. *Harvey,* 4 Ad. & El. 870, and the previous holding of Lord Kenyon restored, which has continued to be the law of England. In Bill of Exchange Act, section 90, good faith is defined as follows: "A thing is deemed to be done in good faith, within the meaning of this act, where it is in fact done honestly, whether it is done negligently or not."

Code, section 5618, Negotiable Instruments Act, section 56, reads thus:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same the person to whom it is negotiated must have had actual knowledge of the infirmity or defect or knowledge of such facts that his action in taking the instrument amounted to bad faith."

The test in Virginia, and in the majority of the States, is not whether the plaintiff was negligent in acquiring the notes, but whether or not he acted in good faith. If the facts and circumstances of the transaction are such that bad faith may be inferred, it then becomes a question for the jury.

The notes here involved were complete and regular upon their face, plaintiff acquired them for value before maturity. The only witnesses who testified on the subject were Bowles, who acted for the bank, and Calhoun, who indorsed and transferred them. There is a slight discrepancy between the two as to exactly what was said at the time, but there is nothing in the testimony of either to show in the slightest degree that the bank had actual knowledge of any infirmity or defect in the title of the holder of the notes when they were acquired by it.

Defendant practically admits these facts, but contends that the fact that the notes were offered to be sold or discounted at ten per centum less than the principal was sufficient to support an instruction leaving it to the jury to say whether or not the bank, in the exercise of good faith,

should have made inquiry of Moore before discounting or purchasing the notes.

The facts in this case are very similar to those in *City Nat. Bank* v. *Hundley,* 112 Va. 51, 70 S. E. 494. There one McChesney, a stranger to the bank who was introduced by a customer, in September, 1908, offered to sell for $1,750 three notes dated December 11, 1907, bearing interest, and maturing one, two and three years from date, totalling $2,-400. The bank made inquiries of the financial standing of the parties liable thereon, and upon being assured of their solvency, purchased the notes, at the price stated. They were not paid and action followed. On demurrer to the evidence it was held that the bank was entitled to recover. It was stated in the opinion that no importance was attached to the fact that there were several small credits upon the notes and that McChesney was not required to indorse them.

In *Fleshman* v. *Bibb,* 118 Va. 582, 88 S. E. 64, the notes were sold the next day after their execution at a discount of twenty per centum. In this case, however, the maker testified that at the time the notes were transferred to the holder he did not suspect any fraud or failure of consideration.

The holder of a negotiable instrument for which he has paid valuable consideration before maturity "is not bound at his peril to be on the alert for circumstances which might possibly excite the suspicion of wary vigilance; he does not owe to the party who puts the paper afloat the duty of active inquiry in order to avert the imputation of bad faith. The rights of the holder are to be determined by the simple test of honesty and good faith, and not by a speculative issue as to his diligence or negligence. The holder's rights cannot be defeated without proof of actual notice of the defect in title or bad faith on his part evidenced by circumstances. Though he may have been negligent in taking the paper, and omitted precautions which a prudent man would have taken, nevertheless, unless he acted *mala fide,* his title, according to settled doctrine, will prevail."

*Cheever* v. *Pittsburgh, etc., R. Co.,* 150 N. Y. 59, 44 N. E. 701, 703, 34 L. R. A. 69, 55 Am. St. Rep. 646.

It is generally recognized that negotiable paper may be offered for sale at such a grossly inadequate price as to charge the purchaser with notice of equities existing between prior parties, and when paper is so acquired the purchaser is guilty of bad faith, which will defeat recovery. But no such state of facts is disclosed in this record which justifies such a conclusion as a matter of law. The good faith of the purchaser having been submitted to the jury on instructions free from reversible error the finding is conclusive.

For the reasons stated, the judgment will be affirmed.

*Affirmed.*