### COMMERCIAL TRUST CO. OF NEW JERSEY v. KEALEY et al.

No. 4174.

Circuit Court of Appeals, Fourth Circuit.

Oct. 18, 1937.

398

Patrick A. Gibson, of Richmond, Va., and James E. Heath, of Norfolk, Va. (Page & Leary, of Richmond, Va., on the brief), for appellant.

Tazewell Taylor, of Norfolk, Va., for appellees.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

The principal error charged on this appeal by the Commercial Trust Company of New Jersey, trustee, plaintiff in the District Court, was the failure of the court to direct a verdict in its favor as the holder of four promissory notes dated October 28, 1930, for $5,000 each and payable by Robert B. Kealey and A. J. Brennan to the Terrill Bond & Mortgage Company or bearer at Chicago, Ill. Two of the notes, numbered 4 and 5, were payable in two years, and the other two notes, numbered 2 and 3, in three years after date, with interest at the rate of 5 per cent. per annum until paid. It was conceded that the notes, together with another note for $3,000, of like tenor, had been lodged with the Terrill Bond & Mortgage Company as collateral security for the payment of 230 notes of $100 each dated November 1, 1930, and payable by the defendant Kealey to the Terrill Company. The latter notes were executed in consideration of the sum of $23,000 loaned by the Terrill Company to Kealey, and were to have been made payable in thirteen years after date according to an agreement between the parties; but they bore no date of maturity when delivered, and subsequently a maturity three years after date was inserted without the knowledge of the makers. The collateral notes numbered 4 and 5 were indorsed by the payee and wrongfully delivered on June 22, 1931, to Matthew J. Woods in violation of the collateral agreement, although there had been no default in the payment of the principal indebtedness; and collateral notes numbered 2 and 3 were indorsed and wrongfully delivered in like manner to the said Matthew J. Woods on May 21, 1932. The principal notes were actually paid in full when presented. Thereafter all of these collateral notes were transferred and delivered without value by Matthew J. Woods to the plaintiff corporation as trustee.

It is not disputed that the plaintiff stands in the shoes of Matthew J. Woods in this case and is subject to the same defenses that would be available against him were he the plaintiff. He denied that he had any knowledge of the fraud, and the disputed question for decision is whether the plaintiff was entitled to a directed verdict on the notes, or whether the circum-

stances surrounding their acquisition by him were such as to cast a doubt upon his statement and justify the submission of his bona fides to the jury. The District Judge left the issue to the jury, which found against him and rendered a verdict for the defendants.

Robert B. Kealey, one of the defendants, is a priest of the Roman Catholic Church and rector of Holy Trinity Catholic Church at Ocean View, Norfolk, Va. A. J. Brennan, the other defendant, is the Catholic bishop of Richmond, Va., within whose diocese the parish of Holy Trinity is located. In order to raise funds needed for the use of his parish, Father Kealey borrowed $23,000 from the Terrill Bond & Mortgage Company as above described, the bishop joining in the collateral notes for better security. None of the notes had matured when the transactions in suit took place. .

Matthew J. Woods is also a priest of the Roman Catholic Church, as is his brother George A. Woods. The latter was in charge of the Catholic Orphanage at Nazareth, N. C., in the diocese of Bishop William J. Hafey of Raleigh. Father Matthew was formally connected with the diocese of Seattle but had lived at the orphanage for eighteen years and helped with the work. He had solicited funds for the orphanage, traveling as far as the Pacific Coast. For years prior to 1929 he bought securities from the Terrill Company. On account of bad health he had resided in New York for several years prior to his acquisition of the collateral notes. On March 15, 1929, the two brothers, as donors, executed a deed of trust to the Commercial Trust Company of New Jersey, the plaintiff corporation, whereby they conveyed certain property listed on an annexed schedule in trust to provide an income for the orphanage. The property was said to be worth more than $100,000 at the time and to have a par value of $160,000 at the time of trial. The income of the trust at one time amounted to between $10,000 and $12,000 per year. The donors did not relinquish entire control of the trust property or the income therefrom. A salary of $100 per month, payable out of the income, was reserved to Father Matthew for life and after his death to his brother for life. By the terms of the trust, the net income was to be paid to Bishop Hafey annually for the benefit of the orphanage; but the payments to the bishop were not to com-

mence until the donors, or either of them, gave written notice to the trustee; and, if both donors should die before notifying the trustee, then the annual payments of income should not commence until after the corpus of the trust should have reached the sum of $1,000,000. The trustee has never been notified to pay the income to the bishop, and was still in charge of the fund at the time of trial.

It was provided that the donors might from time to time increase the trust fund by transferring additional moneys, securities, or property; that they, or the survivor of them, reserved the right to make withdrawals of all or any part of the principal or income of the trust fund as they or either of them in his discretion might deem proper for the benefit of the orphanage, with no obligation on the part of the trustee to see to the application of the withdrawal. Power was given to the trustee, subject in each instance to the written consent and approval of the donors or either of them, to sell, exchange, invest, and reinvest the trust property. The donors, jointly during their lifetime, and the survivor reserved the right at any time to amend, alter, and modify the terms, conditions, and agreements of the trust relative to the amounts or the persons or objects for which the net income of the trust should be paid by the trustee. The trustee agreed to keep books of account showing the condition of the trust estate which should be open at all times to the inspection of the donors or either of them.

Although the orphanage was subject to the authority of Bishop Hafey, as Bishop of the Diocese of Raleigh, and although the deed of trust provided that the income of the trust was to be paid to the bishop under the conditions above recited, he was not notified of the creation of the trust on March 15, 1929, when the deed was executed; nor did he ever hear of it before the present suit was entered on October 19, 1935, when he was notified by Father Kealey, one of the defendants. In the meantime the relationship of the donors with the orphanage was terminated, when the bishop in the year 1931 called for the resignation of Father George, notified Father Matthew that he no longer had any affiliation with the institution and sent out a notice that the brothers were no longer connected therewith.

In the same year 1931 Father Matthew became apprehensive about the security of

certain real estate mortgage bonds which had been purchased from the Terrill Company and placed in the trust fund. He testified that he withdrew from the trust $33,000 of the bonds of the Marquette Boulevard Apartments due July 15, 1931, and took them with him from New York to Chicago; that on June 22, 1931 he received notes 4 and 5 for $5,000 each from the Terrill Company in Chicago in exchange for certain matured bonds and certain money. The trust officer of the trustee testified that he had turned over certain Marquette bonds to Father Matthew about this time, but the latter could not remember with certainty that he gave the Marquette bonds for the notes or indeed what he gave for the notes. A letter written by him on March 24, 1931, indicates that he had no money at that time, and hence it can hardly be inferred that a large amount of cash was given for notes 4 and 5 on June 22, 1931. There was considerable cross-examination as to the consideration for this transfer but, except for a receipt given by Father Matthew for the Marquette bonds, the records of the trustee were not produced to show what securities were withdrawn from the fund at the time of the acquisition of the notes, and the records of the Terrill Company were not produced to show what was given for the notes.

In contrast with this uncertainty, the evidence of Father Matthew as to what he gave to the Terrill Company in 1932 for notes 2 and 3 for $5,000 each was specific. He produced from the custody of the trustee two statements from the Terrill Company dated respectively May 21 and May 27, 1932, at 60 Wall Street, New York, where the company then had an office. The first statement charged him with $5,000 for note No. 2 and credited him with overdue coupons in the amount of $3,027.50 on five several sets of bonds previously purchased from the Terrill Company—$35 for other bond interest, $250 for interest on Brennan notes Nos. 4 and 5 not then due, $268 as a discount, $100 as a donation and $1,319.50 on a check given by Father Matthew Woods, or $5,000 in all. The evidence shows that when he returned from his visit to Chicago, May 21, 1932, he brought back $21,000 bonds, but how he acquired them is not explained.

From these statements it is obvious that the greater part of the consideration paid for note No. 2 was of dubious value, consisting in addition to a discount and a donation of overdue interest coupons and real estate mortgage bonds accepted as part payment in 1932 at the depth of the financial depression. There is nothing in the record to show that these coupons ever became of value. There is evidence that the Terrill Company guaranteed the bonds which it sold to Father Matthew, and this evidence tends to explain the willingness of the company to give apparently good promissory notes for questionable coupons. But the Terrill Company itself spoke of the transaction as a preference extended to Father Matthew over its other creditors, as it actually turned out to be, since the company prior to the trial of the pending suit went on the rocks.

The consideration given by Father Matthew for note No. 3 for $5,000 on May 27, 1932, was of similar character. Default had been made in the payment of coupons amounting to $2,100 on two other issues of bonds previously obtained from the Terrill Company. This sum was accepted as a credit on the purchase price of note No. 3, and the balance of $3,000 was made up of a cash payment of $890, a discount of $250, a bond of $500, and additional interest on other bonds amounting to $1,360, or $5,000 in all. The record is not clear as to the value of the $500 bond last mentioned and of the interest item of $1360 above mentioned, but justifies the inference that these also were of doubtful value.

In conflict with these statements, there was testimony by Father Kealey tending to show an admission by Father Matthew that no cash passed at the time of the acquisition by him of the notes in suit.

Allusion has already been made to the admitted facts that, although the deed of trust of 1929 specified that the income from the trust property should be paid under certain conditions to Bishop Hafey, the ecclesiastical head of the parish in which the orphanage is located, no information as to the trust was given to the bishop until after the institution of the suit in 1935 when he was told by Father Kealey, one of the defendants. When Father Matthew was under cross-examination he testified, without objection, that the trust property was purchased with the personal funds of himself and his brother; and that they did not solicit funds for the orphanage after they formed the trust in 1929. Bishop Hafey, on the other hand, testified that, although the brothers did not communicate with him

in regard to the trust at any time, or ask permission to solicit funds for it, they did solicit funds for the orphanage between 1929 and 1931 when he severed their connection with the work, and that the returns should show on the orphanage books, as the brothers had no authority to put them elsewhere.

■ The bishop's testimony in this regard was objected to as irrelevant and improper presumably on the ground that, while it may have been proper on cross-examination of the founder of the trust to inquire into the origin of the fund, the subject was too remote to the issue of bona fides in the acquisition of the notes to justify the reception of contradictory evidence. We think, however, that the evidence was properly received. No objection was made to the cross-examination of Father Matthew as to the source of the fund on the ground of unfair surprise, and no objection on this score would have been tenable. The facts were entirely within the possession of the witness, and the circumstances surrounding the creation of the trust and the handling of the trust funds thereafter were so unusual that they naturally led to the sort of questions that were propounded. Nor was the introduction of the testimony thus elicited likely to lead to a confusion of the issues of the case. The matter was closely connected with the creation and augmentation of the fund for whose protection the suit was brought. The relationship between Father Matthew and Frederick Person, the superintendent of the Terrill Company, was one of considerable intimacy, which resulted in numerous transactions in the purchase and sale of securities in substantial amounts over a long period of years before and after the trust was formed. The source of the funds must have been a matter of interest to Person, for he was not only a man of considerable financial experience, but made a specialty of investing funds for officials of the church. It is a fair inference from the testimony that the subject was discussed between them. Person was not produced as a witness and there was no direct evidence of the extent of his knowledge on the subject; but he had personal knowledge that Father Matthew dealt with the funds with complete freedom, as indeed he had authority to do under the deed of trust which, while purporting on its face to be executed for the benefit of the orphanage, left complete control of the management of the funds to the donors even to the extent of a complete revocation of the trust. The notes were transferred in an effort to rehabilitate the fund, resulting in a preference over other creditors of the Terrill Company. Under these circumstances, if the jury should reach the conclusion that those in charge of the orphanage had reason to conceal the continued solicitation of funds after the formation of the trust, they might also find that Person and Woods had some reason to co-operate in a transaction which involved a fraud upon the makers of the notes. See the discussion of the question of evidence involved in Wigmore on Evidence, §§ 1000 to 1007.

It may be added that Father Matthew, in apparent conflict with his evidence above mentioned, testified that a reference by him in a letter of November 20, 1929, to the hard-luck stories they were getting from their clientele meant the people they were collecting from. Similar inconsistencies in his testimony are found with regard to his relations to the Terrill Company in that he testified that he never solicited business for the company, while certain correspondence between them indicates that they were offering to compensate him for business to be secured by him and that he was on his part endeavoring to secure it.

It is not without significance that Father Matthew made no inquiry of the makers of the notes, although they were important figures in his own church and resided in a neighboring diocese. The notes were somewhat unusual in character, in that they had rather long periods to run before maturity and the interest was not payable until after maturity. Furthermore, an interval of eleven months intervened between the acquisition of notes 4 and 5 on June 22, 1931, and the acquisition of notes 2 and 3 on May 21, 1932. There was of course no obligation on the part of the holder of the notes to make the inquiry, but it would have been a natural thing to do under the circumstances.

■ Upon these facts the important question is whether the plaintiff was entitled to a directed verdict in its favor because of the testimony of Father Matthew that when he received the notes he did not know that the Terrill Company had no authority to negotiate them. It is conceded that the Terrill Company negotiated the notes in breach of faith and that under section 55 of the Uniform Negotiable Instruments Law

its title was defective; and consequently that under sections 52 and 56 of the Act Father Matthew was not a holder in good faith, unless at the time of the negotiation of the notes he had no knowledge of the infirmity, that is, no actual knowledge of the infirmity or knowledge of such facts that his action in taking the instruments amounted to bad faith. The burden of proof on the question of knowledge in such case is fixed by section 59 of the act, which provides: "§ 59. Every holder is deemed prima facie to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as holder in due course."

The interpretation to be given to this section of the act is that placed upon it by the Supreme Court of the state by whose law the case is to be determined. Burns Mortg. Co. v. Fried, 292 U.S. 487, 497, 54 S.Ct. 813, 816, 78 L.Ed. 1380, 92 A.L.R. 1193, Williams v. Green (C.C.A.) 23 F.(2d) 796.

■ We must determine not only the nature of the burden of proof imposed upon the holder of the notes, but also whether or not the proof offered was sufficient to justify a directed verdict for the plaintiff, or whether, on the other hand, the case was properly left to the determination of the jury. The notes were negotiated in Illinois, and the case was tried below in the Eastern District of Virginia. The point might be raised that the questions are procedural and hence that the law of the forum should govern. Compare Young v. Lowry (C.C.A.) 192 F. 825, 829, and Crittenden v. Widrevitz (C.C.A.) 272 F. 871. But it is immaterial here because the Uniform Negotiable Instruments Law is in effect in both states (see Smith-Hurd Ann.St. of Illinois, c. 98, §§ 21–218; Virginia Code 1936, §§ 5563–5757); and the law on the questions at issue in both states seems to be in accord with the weight of authority in this country. Under the decisions the burden of proof resting upon the holder of notes negotiated in bad faith is not merely to show that he acquired the instruments before maturity and for value, but he must also show that he had no notice of the infirmity or defect, Bell v. McDonald, 308 Ill. 329, 139 N.E. 613; Coopersmith v. Mahoney, 150 Va. 685, 143 S.E. 313; Williams v. Green (C.C.A.) 23 F.(2d) 796; First

Nat. Bank & Trust Co. of Muskogee v. Heilman (C.C.A.) 62 F.(2d) 157; and the burden upon him is not only that of going forward with the evidence, but the burden of establishing good faith by a preponderance of the evidence and persuading the jury of the truth of his testimony, Justice v. Stonecipher, 267 Ill. 448, 108 N.E. 722; Hoenigman, "Proof of Good Faith," 23 Mich.L.R. 870; "Burden of Proof under Section 59 of the Negotiable Instruments Law," 80. U. of Pa. L. R. 717; 8 Am.Jur. Bills and Notes, § 1031.

■ This rule, however, does not mean that the credibility of the testimony of an interested holder as to the lack of notice of the defect is always for the jury. On the contrary, if the evidence of lack of knowledge of the infirmity in the paper is uncontradicted and the proven circumstances do not admit of a rational inference of knowledge or bad faith on the part of the holder, the court may rightfully instruct the jury in his favor. This rule is applied in the state as well as in the federal courts; Coopersmith v. Mahoney, 150 Va. 685, 143 S.E. 313; Edelen v. First Nat. Bank, 139 Md. 413, 115 A. 599; Mack v. Dailey (C.C.A.) 3 F.(2d) 534; 72 A.L.R. 27, note.

■ But, if the circumstances surrounding the negotiation and purchase of the instrument are such that bad faith may be inferred, the question whether the plaintiff is a holder in due course becomes one for the determination of the jury even if there is direct and positive testimony by the holder that he had no guilty knowledge. Foncannon v. Lewis, 327 Ill. 455, 159 N.E. 35; Moore v. Potomac Sav. Bank, 160 Va. 597, 169 S.E. 922, 91 A.L.R. 1133. See, also, Duncan v. Carson, 127 Va. 306, 103 S.E. 665, 105 S.E. 62; Goodloe v. Smith, 158 Va. 571, 164 S.E. 379; Farmers' State Bank v. Cooke, 149 Minn. 227, 183 N.W. 137; Arnd v. Heckert, 108 Md. 300, 70 A. 416; Vogel v. Pyne, 197 App.Div. 633, 189 N.Y.S. 285; Cedar Point State Bank v. Youtz, 200 Iowa 86, 204 N.W. 233; Auld v. Walker, 107 Neb. 676, 186 N.W. 1008; Holland Banking Co. v. Booth, 121 Ark. 171, 180 S.W. 978; Security Nat. Bank v. Porter, 79 N.H. 344, 109 A. 46; Manufacturers' Finance Co. v. Amazon Cotton Mills Co., 187 N.C. 233, 121 S.E. 439; Commercial Nat. Bank v. Ahrens, 117 Okl. 65, 245 P. 557; Leavitt v. Thurston, 38 Utah 351, 113 P. 77.

■■ Bearing in mind amongst the circumstances of the pending case the un-

usual character of the trust, both in its origin and control by the officials of the orphanage, their concealment of the trust from their ecclesiastical superior and their denial of the solicitation of funds after the formation of the trust, the close relationship between the parties to the negotiation of the notes, the absence of evidence showing the precise consideration given for the first two notes, and the unsatisfactory character of the consideration alleged to have been given for the second two notes, and also the conflicts of evidence above described, and considering these facts in the light most favorable to the defendant, as we must do in deciding the question of a directed verdict, we cannot say that the evidence so clearly establishes the plaintiff's contention as to require the District Judge to take the case out of the hands of the jury and decide it in the plaintiff's favor. On the contrary, we think that the District Judge was justified in submitting the issue to the jury, and that the judgment should be affirmed.

PARKER, Circuit Judge (dissenting).

I think that, upon the evidence in the record, verdict should have been directed for the plaintiff. Upon the proof of fraud in the negotiation of the notes sued on, the burden of proof, it is true, rested upon plaintiff to show that it was a holder in due course, and, as the plaintiff occupied the same position as Father Matthew Woods with respect to the paper, the burden resolved itself into a showing that he was a holder in due course; but this burden, in view of the provisions of section 56 of the Uniform Negotiable Instruments Law, was merely one of showing that he took the notes for value and without knowledge of the defect in title and not under such circumstances as amounted to bad faith. The testimony shows beyond question that the notes were acquired for value.

Father Woods specifically denies knowledge of the defect in title, and I can find nothing in the circumstances which justifies the conclusion that he did have such knowledge or that he acquired the notes in bad faith. The bonds and coupons which he surrendered for them were guaranteed by the Terrill Bond & Mortgage Company as well as secured by mortgages on real estate; and there is nothing to show that at that time he knew the Terrill Bond & Mortgage Company to be insolvent or that he was entering into a conspiracy with its

officers to accept paper which it had no right to transfer and thus perpetrate a fraud upon one of the bishops of his church. The case is not one resting upon the unsupported testimony of a holder. Letters and telegrams passing between the parties with respect to the last two notes clearly negative, in my opinion, any knowledge on the part of Father Woods of any defect in the title to the paper or any bad faith in its acquisition.

Thus on May 20, 1932, he sent checks aggregating $1,454.50 in payment of the balance due after application of other items on the purchase of one of the Brennan notes. The next day, May 21, 1932, upon the dishonor of certain Southgate coupons which the Terrill Bond & Mortgage Company had guaranteed, he sent the following telegram to that company: "Southgate coupons due April twelfth aggregating fourteen eighty seven fifty returned today unpaid Stop Return our checks for fourteen fifty four fifty sent you yesterday plus your check thirty three to balance and will send you the coupons Wire reply."

In reply to the telegram the Bond & Mortgage Company wrote him the following letter, setting forth the proposition under which the last of the Brennan notes was purchased, viz.:

"I have just received your wire in reference to Southgate coupons aggregating $1,487.50 plus Springfield coupons which we have written you about in another letter in the amount of $612.50 or a total credit for coupons of $2,100.00.

"This we will allow as a credit on the other $5,000.00 Bishop Brennan Note and as you will have some additional coupons due in June I am enclosing the $5,000.00 Bishop Brennan Note, which you can keep custody of until all credits have been received in the form of coupons which are past due and will be shortly due.

"In other words, I trust you to hold this Bishop Brennan Note until we have made our final adjustment. Therefore the check which apparently you have sent by mail will be banked in the usual manner and kindly make preparations to see that it is honored on presentation. Meantime you have received credit for $2,100.00 on the purchase of an additional Bishop Brennan Note in the amount of $5,000.00 which we are enclosing, leaving a balance due of $2,-650.00 which can be equalized by the payment of coupons to become due or whatever accrued interest will become due on

the exchange when it has been accomplished. I must have some justification for the payment of past due coupons in turning over to you Bishop Brennan's Notes as we are preferring you over others and I am subject to criticism and censure when I deliver Bishop Brennan Notes to you without any cash payment on same. I hope you will understand what I am confronted with."

Finally, in a letter of May 28, 1932, Father Woods proposed to buy further paper of this character, saying:

"George makes me understand that I have so many TBM Bonds, my account is all one sided. Something should be done to make for a broader diversification, even tho there may be some loss to be absorbed thereby. A local Bond Salesman wishes to sell some of the TBM for me, but I think possibly you'd prefer to do this for me yourself if there is any market at all. What can you do for me in the matter?

"Further: I have some Cash on hand and some more to come in soon—and the investment market is very attractive right now. But if I can kill two or three birds with one stone; (read on and you'll understand about the stone) so much the better. I propose to buy from you some of the Bishops paper if you have any for sale, paying therefor in TBM Bonds for four-fifths of the amount due, plus cash for the final fifth. Would such a plan appeal to you? The Bishops paper need not necessarily be that of Bishop Brennan—that of almost any of the Catholic Bishops would be satisfactory I presume, tho I'd like to see the individual notes before acceptance of course. By this method, I'd be cutting down the amount of my bond holdings, helping the Bishops to carry their financial difficulties, and at the same time, possibly, be helping you by feeding you a bit of Cash now and then."

It is hard to believe that the holder of coupons secured by mortgage and indorsed by a supposedly solvent Bond & Mortgage Company would surrender them and pay in addition a considerable amount of cash for notes which he knew were being negotiated in fraud of the maker and which he would probably have great difficulty, for that reason, in collecting; and especially is this hard to believe where the acceptance of the notes under such circumstances would involve a priest of the church in the perpetration of a fraud on one of its bishops. When letters and telegrams, written at the time, so conclusively negative bad faith or knowledge of the fraud as do the letters and telegram which I have quoted, I feel that the matter should not have been left to the speculation of the jury but that verdict for the plaintiff should have been directed.