# Wytheville.

## PEOPLES NATIONAL BANK OF ROCKY MOUNT V. N. MORRIS.

June 13, 1929.

The opinion states the case.

*C. C. Lee, A. H. Hopkins* and *Woods, Chitwood, Coxe & Rogers*, for the appellant.

*H. D. Dillard*, for the appellee.

HOLT, J., delivered the opinion of the court.

On June 16, 1926, the Farmers Mercantile Company executed its deed of general assignment to John P. Lee, trustee, conveying among other things a large brick store-house and a smaller frame store-house, both in Rocky Mount, Virginia. There was already on the brick building a trust deed to the same trustee, of date June 1, 1920, securing notes amounting to $28,000.00, owned in part by the First National Bank of Rocky Mount. On June 2, 1926, that bank, by contract hereafter to be considered more in detail, turned over its assets to the Peoples National Bank, and this last named bank, on July 10, 1926, foreclosed the trust deed of June 1, 1920, on the brick building which left in the hands of Lee, trustee, under the deed of June 26, 1926, the frame store-house, store furniture, etc., all of which was sold on July 24, 1926, for $5,219.11. This suit was originally brought by the trustee that he might be advised as to the proper distribution of the proceeds of sale, which, after the payment of preferred charges, amounted to $3,078.61.

Its proper distribution was referred to a master commissioner, who, ratably distributing the same, gave

to the Peoples National Bank $1,641.97 and to N. Morris, $213.38, that being a little over 11% of indebtedness proved. On June 10, 1920, the mercantile company leased a part of the brick store to N. Morris for a term of five years, and on January 16, 1925, executed to him a new lease for five years, to run from July 1, 1925, at an annual rental of $1,860.00, payable in monthly installments of $155.00, due on the first of each month.

W. R. Davis was president of the Farmers Mercantile Company, and was also cashier of the First National Bank, and had been for ten years preceding the transfer of its assets to the Peoples National Bank. On May 1, 1926, he collected from Morris $1,150.00 rent in advance to January 1, 1927, and on the day on which the First National Bank closed its doors, or on the day before, collected from him, in addition, rent to July 1, 1927. The property so rented was sold under the trust deed of June 1, 1920, and on July 10, 1926, so that after making certain adjustments there was due to Morris $1,808.34, with interest from the first day of July, 1927, that being advance rent by him, for which he has received no consideration since this property covered by the paramount trust deed was sold from under him.

It is claimed that Davis practiced a fraud upon him in obtaining these advance payments, in that he knew the lessor company to be insolvent, and that the storeroom might be sold at any time notwithstanding the lease. With this probability before him, he assured the lessee that he would be permitted to remain in possession until the advance rent had been earned. It is also claimed that the bank is liable because Davis was its cashier and agent and because this rent money finally went to it. As a last link in the chain of claims, Morris contends that the Peoples National Bank, in.

taking over all of the assets of the First National Bank, took them *cum onere*, and charged with a trust or an equitable lien growing out of the fraud perpetrated by its assignor's agent.

This view was adopted by the trial court, which in its decree gave a personal judgment against the Peoples National Bank for $1,808.34 and directed Lee, trustee, to apply thereon the two sums of $1,641.97 and $213.38, the first being the dividend theretofore reported as due to the Peoples National Bank under the deed of June 16, 1926, and the second Morris' share of what was held to his credit under that assignment.

To the extent that these payments were directed to be made by the trustee out of trust funds in his hands designated in the decree, the order partakes of the nature of one *in rem*. It went further, however, and gave personal judgment against the Peoples National Bank. This was error.

"In order to render the purchasing company personally liable for the debts of the selling corporation, it must appear that (a) there be an agreement to assume such debt; (b) the circumstances surrounding the transaction must warrant a finding that there was a consolidation of the two corporations; or (c) that the purchasing corporation was a mere continuation of the selling corporation; or (d) that the transaction was fraudulent in fact." *Luedecke* v. *Des Moines Cabinet Co.*, 140 Iowa 223, 118 N. W. 456, 32 L. R. A. (N. S.) 616. 7 R. C. L., page 183; Cook on Corporations (6th ed.), section 673.

There was no general assumption of debts; there was no consolidation; the business was not continued by the purchasing corporation and certainly as to it there was no fraud.

Having reached the conclusion that a personal judg-

ment could not be given against the Peoples Bank, we are next to inquire if assets in its hands can be followed by Morris, because of any trust fund doctrine or equitable liens.

The principles relied upon are thus stated in *Williams* v. *Commercial Bank*, 49 Ore. 492, 90 Pac. 1012, 91 Pac. 443, 11 L. R. A. (N. S.) 857: "The authorities seem to be uniform to the effect that the assets of the corporation are subject to an equitable lien in favor of the creditors, and that such creditors may follow such assets, or the proceeds thereof, into whosesoever hands they can trace them and subject them to such debts, except as against a *bona fide* purchaser for value. And where a corporation transfers all its assets to another corporation with a view of going out of business, and nothing is left with which to pay its debts, such transferee is charged with notice by the very circumstance of the transaction, and takes the same *cum onere*. Such a case cannot be considered a sale in the due course of business, even though based on a valuable consideration, as it operates as a fraud against the creditors."

Without stopping to inquire as to the applicability of this rule to a case where the purchase is for full value and without notice, we will take up the contract of June 2, 1926, under which the Peoples National Bank took over the assets of the First National Bank. On it must rest such claim as Morris may have against the Peoples Bank. It provides *inter alia:*

"IV. The party of the second part for the consideration hereinbefore stated agrees and binds itself to pay (a) all debts due the United States government by the party of the first part, and all taxes for which the party of the first part is legally liable; (b) all necessary and proper expenses incident to the transferring of the

business, including the preparation of papers, contracts, minutes, and the cost of stationery, clerk hire, if any, etc., incident to transfer, etc.; (c) amounts due depositors of the party of the first part when and as called for, all expenses incurred by the party of the second part in the collection of the assets, all taxes, and all necessary expenses in handling the business, except the party of the second part shall make no charge for rental or for clerical help for its services in the regular course of business after the transfer has been fully consummated.

"V. It is further covenanted and agreed that whatever, if anything, of the assets herein assigned remains after paying the above liabilities, expenses, fees, costs, etc., shall be returned to the party of the first part, or to its order, or to the liquidating agent of the said party of the first part, if such agent is required by the Comptroller of the Currency, but in the event that there shall be no other agency, previously designated by the party of the first part to receive such surplus assets, they shall be turned over to Jas. P. Woods, C. J. Davis and H. D. Dillard, who are hereby designated as trustees for the shareholders according to their respective holdings of the capital stock."

Provision was also made for the execution of a $100,-000.00 bond as an additional security to the Peoples Bank against loss.

This is not a sale by one corporation of all of its assets to another, and so cases dealing with such a state of facts are not very helpful. That the Peoples Bank did take over these assets for full value and without notice cannot be seriously questioned, but it did not take, as against the assignor, absolute title. It took them to be used for certain purposes and none other, purposes expressed unambiguously in the con-

tract of transfer. Out of their proceeds it was to pay certain preferred charges and depositors whose claims amounted to something more than $800,000.00. When this had been done, the contract provided "that whatever, if anything, of the assets herein assigned remains after paying the above liabilities, expenses, fees, cost, etc., shall be returned to the party of the first part or its order," etc.

If to pay its depositors the First National Bank had pledged all of its assets as security for a loan, that would have been a lawful contract, and the lending bank, to the extent of money advanced, would be a holder for full value and without notice.

"Where an insolvent bank transfers its assets, name and franchise to another corporation, the latter is responsible to the creditors of the former. But when a bank does not surrender or forfeit its charter, but simply quits business and transfers the accounts of its depositors to another bank from which it borrows money to pay its depositors, and pledges its assets as security for the money so borrowed, the second bank is not liable to the creditors of the first bank." Morse on Banks and Banking, (6th ed.), section 320. *Overstreet* v. *Bank*, 12 Okla. 383, 72 Pac. 379.

Looking at the substance of things, this is what was done: The Peoples Bank was not to retain a dollar of collections but was to apply them on the obligations assumed and when these obligations were paid, the residue was to go back to the First National Bank. The purpose is plain. It was in the interest of the public generally and wholly free from any sinister designs; depositors were protected while profit to the purchaser was the imponderable one which might follow new customers. It was not paid one dollar in cash.

Morris cannot recover for another reason. It is true that Davis was president of the mercantile company and was at the same time cashier of the First National Bank. If we assume that he perpetrated a fraud upon Morris in the collection of these advance rents, as to which we express no opinion, it does not follow that the First National Bank was liable therefor, merely because he was its cashier.

The general rule applicable thereto has been thus stated: "The general rule that a principal is bound by the knowledge of his agent is based upon the principle of law: That it is the agent's duty to communicate to his principal the knowledge which he has respecting the subject matter of negotiation, and the presumption that he will perform that duty." *The Distilled Spirits,* 11 Wall. 356, 20 L. Ed. 167; *Baker* v. *Berry Hill Co.,* 112 Va. 280, 71 S. E. 626, L. R. A. 1917-F, 303.

This general and salutary rule is subject to certain equally well established exceptions, as was observed by Judge Taft in *Thomson-Houston Electric Co.* v. *Capitol Electric Co.* (C. C. A.), 65 Fed. 343:

"The truth is that where an agent, though ostensibly acting in the business of the principal, is really committing a fraud, for his own benefit, he is acting outside of the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it."

The reason for the rule favored by another able court is: "It has been suggested that the true reason for the exception is that an independent fraud committed by an agent on his own account is beyond the scope of his employment, and therefore knowledge of it, as matter of law, cannot be imputed to the principal, and the principal cannot be held responsible for it. On this view, such a fraud bears some analogy to a tort

wilfully committed by a servant for his own purposes, and not as a means of performing the business entrusted to him by his master." *Allen* v. *South Boston R. Co.*, 150 Mass. 206, 22 N. E. 919, 5 L. R. A. 716, 15 Am. St. Rep. 185.

In *Baker* v. *Berry Hill Co.*, *supra*, this court said:

"Another instructive case in point is that of *Brookhouse* v. *Union Pub. Co.*, 73 N. H. 368, 62 Atl. 219, 2 L. R. A. (N. S.) 993, 111 Am. St. Rep. 623, 6 Am. & Eng. Ann. Cas. 657, to which there is an extended note in the last named publication reviewing a great number of decided cases, the conclusion being that the exception to the broad proposition that notice to the agent is not to the principal, viz., where the knowledge is acquired by an officer of a corporation, while not acting for the corporation, but while acting for himself, is not imputable to the corporation, finds support in the decisions of the highest courts of England, the United States courts, and the courts of twenty-seven States of the Union, citing the cases.

"In *Gunster* v. *Scranton Illuminating Co.*, 181 Pa. 327, 37 Atl. 550, 59 Am. St. Rep. 650, the question is elaborately and ably discussed, and a number of the cases relied on by counsel for appellants to sustain their side of the question are criticised.

"The opinion of this court in *Martin* v. *South Salem L. Co.*, 94 Va. 58, 26 S. E. 600, is in line with the long list of cases to which the above cited belong, and says: 'A corporation is not affected by the knowledge of an agent, when he himself contracts with it, or otherwise deals with it in a transaction in which his interests are opposed to the interests of the company, for in such a transaction he could not represent the company.' "

The mercantile company was insolvent, and this its president, Davis, knew. He had made certain

advances on its behalf and was anxious to protect himself before the crash came. His knowledge is the only knowledge that can be imputed to his bank. The transaction was for his benefit alone. Collections so made were placed in his bank to the credit of the mercantile company on a checking account. He and Morris were friends. He was asked:

"Q. Mr. N. Morris, when he made these payments in advance to you, did so for your *accommodation*, did he not?

"A. Yes."

And again on cross-examination:

"Q. You deposited, then, these collections to the credit of the Farmers Mercantile Company and checked the same out to refund to yourself what you had paid for the Farmers Mercantile Company. Is that correct?

"A. These items, amounting to about the amount of the deposit, were interest items, etc., on monies that I had paid in the last few months."

On redirect examination, he made this statement:

"Q. You stated in your cross-examination that these items of indebtedness of the Farmers Mercantile Company you carried yourself. State whether or not in carrying those items you were forced to borrow money from the First National Bank to do it?

"A. Yes."

That Davis was not authorized to collect this rent is perfectly plain, and it is likewise plain that there was no ratification unless ratification can be tortured out of the fact that this rent money, after passing through the hands of the mercantile company and through the hands of Davis, was used to pay to the bank debts presumably solvent. Indeed the bank was a loser through these transactions. They resulted in

increasing the general indebtedness of the mercantile company by over $1,800.00, which in turn decreased the sum which the bank took under the deed of June 16, 1925, as a general creditor entitled to participate ratably in the estate of the assignor.

We may restate the situation from the bank's viewpoint in this wise: It held notes of its cashier, an official of ten years standing. We may presume that they were satisfactorily indorsed or secured by solvent collateral. No favor is done a bank when such obligations are paid. One satisfactory investment is at an end and another must be found. Moreover these notes were paid in the ordinary course of business. If banks could not in safety accept such payments until after inquiry as to sources from which the money came, banking would be at an end.

Much that has been said was upon the theory that Davis was party to a fraud, but that we have expressly declined to pass upon as a matter of fact. It is not necessary to a decision of this case. If he was not, nothing more is to be said, and if he was, the Peoples National Bank is not liable for reasons stated.

Morris is entitled to receive the $213.38 which the report of the master commissioner showed was in the hands of Judge Lee, as trustee for the mercantile company, and no more, and he is not entitled to recover from the Peoples National Bank anything, and it is so ordered. The decree appealed from is to this extent reversed.

*Reversed.*