# Richmond

## NATIONAL BANK OF SUFFOLK V. AMERICAN BANK AND TRUST COMPANY.

November 15, 1934.

Present, Campbell, C. J., and Epes, Hudgins, Gregory, Browning and Chinn, JJ.

The opinion states the case.

*W. R. L. Taylor,* for the plaintiff in error.

*Crumpler & Crumpler* and *Hugh L. Holland,* for the defendant in error.

CHINN, J., delivered the opinion of the court.

This is an action by notice of motion brought by the American Bank and Trust Company, of Suffolk, Virginia, against the National Bank of Suffolk, to recover the sum of $5,500, claimed to be due the plaintiff bank on a draft executed by the National Bank of Suffolk for that amount. By consent of parties all matters of law and fact were submitted to the court, without a jury. The court entered judgment in favor of the plaintiff below for the sum claimed, with interest and costs, whereupon the National Bank of Suffolk applied for and obtained this writ of error.

The facts surrounding the transaction, which are undisputed, are as follows:

The plaintiff and defendant banks are located just across the street from each other in the city of Suffolk. At the time of the transaction involved in this suit, E. E. Jones was cashier of the plaintiff bank, and R. B. Hill was cashier of the defendant bank. The most cordial and friendly relations existed between these banks, and daily clearances were made between them at a certain designated hour.

On or about April 2, 1930, R. B. Hill obtained a personal loan of $5,500 from the American Bank and Trust Company, giving his note therefor, indorsed by P. S. Brinkley. This note matured on or about June 2, 1930, but was not taken up by Hill at maturity. On June 5, 1930, Hill presented to the plaintiff bank, in payment of his note and accrued interest thereon, his personal check for $5,530.68, drawn in favor of the plaintiff bank, upon his individual account at the National Bank of Suffolk. The note evidencing the debt, indorsed by P. S. Brinkley, was at the time of the delivery of the check, delivered to Hill. The check was delivered to the plaintiff after clearance hours

on June 5th, and, consequently, was held over until the next day's clearance when it, among other checks drawn on the defendant bank, was presented and cleared in the usual course of business. On June 7th it came to the attention of Mr. A. Woolford, vice-president of the defendant bank, that the check of R. B. Hill had been cleared and that Hill had no funds to his credit with which to pay it. Woolford thereupon personally sought out Jones, cashier of the plaintiff bank, informed him of the situation, and requested him to refund the money. In answer to inquiries by Jones, Woolford told him that Hill was at home sick, whereupon Mr. Jones promptly agreed to refund the money to the National Bank of Suffolk, and this was done in the next day's clearance, which was on June 8th.

Mr. Jones testified that the friendly relations existing between the two banks, and his knowledge that Hill was at home sick, and unable to attend to his personal affairs, actuated him in returning the money to the defendant bank. Immediately following the conversation between Jones and Woolford, Jones dispatched a clerk to Hill's home, where he was then confined on account of illness, and obtained from him a new note upon a collateral form, payable five days after date, and also the original $5,500 note indorsed by P. S. Brinkley, dated April 2, 1930, which was held as collateral.

The National Bank of Suffolk kept some of its funds with the American National Bank in the city of Richmond. Several of the officers of the defendant bank were vested with authority to sign checks drawn upon the funds so deposited, among them being J. A. Vincent, assistant cashier. On the 11th day of June, 1930, at the maturity of Hill's five-day collateral note, in his capacity as cashier of the National Bank of Suffolk, but acting for his own benefit, Hill instructed one of the clerks—a Mr. Howell—to draw a check upon the American National Bank, of Richmond, payable to the American Bank and Trust Company, of Suffolk, for $5,500. When this had been done, Hill presented the check to J. A. Vincent, and directed him to sign the same

as assistant cashier. Hill did not indicate to Vincent for what purpose the check was drawn and signed, but told him that he would be given something to cover same later. Hill then took this check, which was on its face payable to the American Bank and Trust Company, to Mr. Jones, cashier of the plaintiff bank, and said to him: "Ernest, here is your money, Durrette handled my note for me, placing it to the credit of our bank, sent us a telegram to that effect, and I thank you for your kindness." Jones accepted this check and again delivered to Hill his principal note and the collateral. Mr. Hill testified in this connection that he had applied to the American National Bank, of Richmond, through Mr. Durrette, its vice-president, for a loan of $5,500 on his note indorsed by P. S. Brinkley, and that Mr. Durrette had advised him that he would make the loan provided Hill and Brinkley would furnish financial statements satisfactory to his bank; and that he had directed Mr. Durrette to place the proceeds of this note to the credit of the National Bank of Suffolk, to replace the amount withdrawn by the aforesaid check.

On the following day, June 12, 1930, Mr. Woolford discovered that Hill had caused this check to be issued, and that he had applied same to the payment of his personal debt due the American Bank and Trust Company, of Suffolk. He thereupon notified the American National Bank of Richmond, upon which the check was drawn, of the facts and caused payment thereof to be stopped. The check was then returned to the plaintiff bank, and after negotiations between the two institutions failed to result in a settlement, this suit was brought.

It is conceded by counsel for the plaintiff bank that in the transaction above stated Hill was acting for himself, and not in the interest of his bank, and, such being the case, under the established rule declared in *Culpeper Nat. Bank* v. *Tidewater Improvement Co.,* 119 Va. 73, 89 S. E. 118; *Peoples Nat. Bank* v. *Morris,* 152 Va. 814, 148 S. E. 828, and kindred cases, Hill's knowledge cannot be imputed to the defendant bank, and said bank cannot, therefore, be

held responsible for his acts on the ground of agency on the part of Hill.

Plaintiff claims, however, that the transaction is governed by the Negotiable Instruments Law, upon the theory that when the check sued on was delivered to it by Hill, it became "holder in due course" under the provisions of that act, and, that none of the facts and circumstances surrounding the transactions are sufficient to show that its action in taking the instrument amounted to bad faith. It is contended by the defendant bank, on the other hand, that the plaintiff is not a "holder in due course" for the reason that the check was not "negotiated" to the plaintiff according to the provisions of said act; and furthermore, that even if said check had been so negotiated, the plaintiff had knowledge of such facts at the time as put it on notice of the irregularity in the issuance of the check.

The pertinent provisions of the Negotiable Instruments Law involved in the above contentions are as follows:

Code, section 5752 (N. I. L., sec. 191). *"Definition and meaning of terms.* In this chapter, unless the context otherwise requires * * * 'Holder' means the payee or indorsee of a bill or note who is in possession of it or the bearer thereof. * * * 'Issue' means the first delivery of the instrument complete in form to a person who takes it as a holder."

Code, section 5592 (N. I. L., sec. 30). *"What constitutes negotiation.* Any instrument is negotiated when it is transferred from one person to another in such manner as to constitute the transferee the holder thereof. If payable to bearer it is negotiated by delivery; if payable to order it is negotiated by the indorsement of the holder completed by delivery."

Code, section 5614 (N. I. L., sec. 52). *"What constitutes a holder in due course.* A holder in due course is a holder who has taken the instrument under the following conditions:

"1. That it is complete and regular upon its face.

"2. That he became the holder of it before it was over-

due and without notice that it had been previously dishonored, if such was the fact.

"3. That he took it in good faith and for value.

"4. That at the time it was negotiated to him he had no notice of any infirmity in the instrument, or defect in the title of the person negotiating it."

Code, section 5618 (N. I. L., sec. 56). *"What constitutes notice of defect.* To constitute notice of an infirmity in the instrument, or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of such facts that his action in taking the instrument amounted to bad faith."

Code, section 5619 (N. I. L., sec. 57). *"Rights of holder in due course.* A holder in due course holds the instrument free from any defect of title of prior parties and free from defenses available to prior parties among themselves, and may enforce payment of the instrument for the full amount thereof against all parties liable thereon."

Code, section 5621 (N. I. L., sec. 59). *"Who deemed holder in due course.* Every holder is deemed *prima facie* to be a holder in due course, but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as a holder in due course. But the last mentioned rule does not apply in favor of the party who became bound on the instrument prior to the acquisition of such defective title."

It is admitted that the check was complete and regular on its face, and that the plaintiff bank took it before it was overdue, and for value. The precise question presented for determination is whether or not the draft in question was "negotiated" to the plaintiff under sub-section 4 of N. I. L., section 52 (Code, section 5614, subsection 4), in the manner contemplated by section 30 of said act (Code, section 5592). The question of what constitutes "negotiation," and whether or not the payee of a negotiable instrument can be a holder in due course, has not been directly passed upon by this court, and the decisions of the courts of other

jurisdictions on the subject seem in hopeless conflict. Practically all the cases on the subject, both at home and abroad, are found in the notes in 15 A. L. R. 437; 21 A. L. R. 1365; 26 A. L. R. 769; 32 A. L. R. 289, and 68 A. L. R. 962, and the cases to which said notes are appended, wherein the cases on both sides of the question here involved are analyzed and discussed at length. As there pointed out, according to one line of authorities, the payee of a negotiable instrument, in whose hands the instrument has its inception as an obligation, cannot be a holder in due course; and, according to the other line of authorities, the payee may be a holder in due course. In view of the elaborate and instructive discussion of the question in the notes above referred to, it would seem unprofitable to here undertake to discuss and differentiate these cases. We will, therefore, only refer to a few of the decisions to illustrate the opposing views on the subject.

One of the leading cases holding that a payee cannot be a holder in due course is *Vander Ploeg* v. *Van Zuuk,* 135 Iowa 350, 112 N. W. 807, 808, 13 L. R. A. (N. S.) 490, 124 Am. St. Rep. 275. In that case two persons signed a blank note as joint co-makers with one to whom the instrument was intrusted, and who was conferred with authority to fill it in for $150, or $200, for the purpose of raising money. He filled it in for $2,000 and delivered it to the plaintiff payee—who had no notice that the instrument as delivered was not filled out in accordance with the authority given—in payment of past due indebtedness. After referring to the foregoing provisions of the Negotiable Instruments Act, the court said:

"It seems to us, under these definitions and the application thereof, that the plaintiff was a holder of the note, but not a holder in due course. The latter term seems unquestionably to be used to indicate a person to whom, after completion and delivery, the instrument has been negotiated. In the ordinary case the payee of the instrument is the person with whom the contract is made, and his rights are not, in general, dependent on any peculiarities in the

Law of Negotiable Instruments. The peculiarities of that law, distinguishing negotiable instruments from other contracts, relate to a holder who has taken by negotiation, not as an original party. * * * In other words, we think that 'holder in due course' should be construed as applicable only to one who takes the instrument by negotiation from another who is a holder." The court, however, further said: "We do not mean to say that in no case can the person named as payee in a negotiable instrument be a holder 'in due course.' If A purchasing a draft to be transmitted to B, in payment of A's debt to B, causes the draft to be drawn payable to B, no doubt A is the holder of such draft, and B, taking it for value, becomes a holder in due course. This was true before the passage of the Negotiable Instruments Act. *Armstrong* v. *American Exch. Nat. Bank,* 133 U. S. 433, 10 S. Ct. 450, 33 L. Ed. 747; *Watson* v. *Russell,* 3 Best and S. 34, affirmed in 5 Best and S. 968. There is no reason to think the situation of the parties to such a transaction is different under the act, etc."

In the case of *St. Charles Savings Bank* v. *Edwards,* 243 Mo. 553, 147 S. W. 978, 980, it was held that the payee of a bank check drawn by the cashier of the bank, who delivered the same to the payee in payment of his individual debt, cannot be a bona fide holder thereof so as to require actual knowledge of an infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith. "While the instrument is still in the hands of the original payee, the 'courier' has not started on its career without luggage."

One of the leading cases taking the affirmative view of the question is *Liberty Trust Co.* v. *Tilton,* 217 Mass. 462, 105 N. E. 605, 606, L. R. A. 1915B, 144. In that case the maker signed a note payable to the order of the Liberty Trust Company, and presented it complete in every respect, except as to its amount, which was blank, to the defendant Frank B. Tilton, who for the accommodation of the maker, signed it in blank on the back, upon the representation and agreement by the maker that the indorser's signature

should not be operative, nor the instrument be delivered until one Grant also signed on the back, and that it should then be filled out for $200, and no more. Grant did not sign the note, and the amount of $400 was filled in without the knowledge or authority of the maker of the note. The note was then delivered to the payee, who took it without knowledge of the agreement, and for value and in good faith. It was held that the payee occupied the position as holder in due course under the Negotiable Instruments Act, the court saying:

" 'Negotiation' is defined by section 47, whereby it is provided that 'an instrument is negotiated when it is transferred from one person to another in such a manner as to constitute the transferee the holder thereof.' 'Holder' is defined in section 207 to be 'the payee or indorsee of a bill or note who is in possession of it.' The remaining sentence of section 47, *viz*, 'If payable to bearer, it is negotiated by delivery; if payable to order, it is negotiated by the indorsement of the holder completed by delivery,' was not intended to include all the ways in which an instrument might be negotiated, nor to restrict the comprehensive terms of the preceding sentence. Plainly, under these two sections, a negotiable instrument payable to a named payee is negotiated when the physical possession of it is handed for value to the person named as payee. One effect of the last sentence of section 47 is to describe the method by which the person who first becomes holder may pass title. It does not comprehend all the ways by which an instrument may be negotiated.

"The word 'negotiate' being defined thus in the act, and being given a definition. in conformity to that attached to it by the common law before the passage of the act, it must be held to have the same meaning throughout the statute, in the absence of a strongly countervailing context requiring a different signification. * * * The conclusion follows, that the payee named in a promissory note, who purchases it complete in form for value before maturity, in good faith and without notice of any infirmity in title or otherwise, is

a person to whom it has been negotiated as holder in due course, notwithstanding it was signed in blank by the party to be charged, whose instructions as to the filling of blanks and the delivery have not been followed by the one to whom it was intrusted by him in its incomplete state."

Another leading case in support of the same view is *Ex parte Goldberg & Lewis,* 191 Ala. 356, 67 So. 839, 843, L. R. A. 1915F, 1157, where the question was whether the payee of a negotiable note could recover thereon against a surety who signed the note in reliance upon the false statement of the principal signer that the signature of another ostensible surety upon the note was genuine, and upon the violated condition that other named persons were to sign the note as co-sureties before its delivery to the payee, who had taken the note for value and in good faith in the regular course of business, and without notice of the fraud or breach of agreement. After discussing the adjudged cases on the subject, the Alabama court came to the conclusion that the payee was a holder in due course under the Negotiable Instruments Act. The principal ground upon which the decision was based seems to be that this was a rule at common law, and, therefore, the court felt it could not assent to the fact that the statute had withdrawn from a payee the status of a holder in due course, where he was so regarded and protected prior to its enactment. The court concludes the opinion thus: "It might be conceded that 'negotiated,' as used throughout the act, means always only the transfer from one holder to another after the instrument has been 'issued,' as held in *Herdman* v. *Wheeler* ([1902] 1 K. B. 361) and *Vander Ploeg* v. *Van Zuuk* (135 Iowa 350, 112 N. W. 807, 13 L. R. A. (N. S.) 490, 124 Am. St. Rep. 275), *supra,* which, however, we do not now attempt to decide—without affecting our judgment in this case."

In support of their contention counsel for the plaintiff quote in their brief from Brannan's Negotiable Instruments Law (5th Ed.), page 487 *et seq.,* wherein the author elaborates upon the reasoning of the court in *Liberty Trust*

*Co.* v. *Tilton, supra,* in favor of his view that the payee of a negotiable instrument can be a holder in due course. The same brief also quotes from Mr. Lile's notes in his revision and enlargement of the Third Edition of Bigelow on the Laws of Notes and Checks at page 416, where the author says:

"While, as already indicated, it seems clear that the statute has altered the rule in the case of paper negotiated to the payee, in breach of faith, *before the filling of blanks,* so the holder is put on notice of the agency, yet on principle and by the great preponderance of authority, the statute has not altered the unwritten rule that a payee may be a holder in due course of paper in which blanks have been wrongfully filled." Mr. Lile then goes on to state that section 191 of the Negotiable Instruments Act declares a "holder" to be a "payee or indorsee in possession of the instrument." That if the payee is thus a holder, he is within the provision of section 52 in the act, defining a "holder" in due course. He then concludes: "If the language of the first clause of the section (52) embraces a payee-holder, as clearly it does, then necessarily sub-section 4 contemplates him as a person to whom the instrument may be 'negotiated,' and the maker as a 'person' (not holder) negotiating it. Furthermore, as the payee in such case is not a party to the original transaction giving rise to the equity asserted, he becomes holder by a purchase of the instrument from, or through, the person against whom the equity exists, namely, the unfaithful intermediary."

"Thus, M, maker, executes a note payable to the bank of Q, with the amount blank, and delivers it to A with the understanding that the amount to be inserted shall not exceed $300, and A fraudulently fills the blank for $1,000, and discounts the note at the Q bank for his own benefit—the bank ignorant of the fraud. Here the equity of the maker arises out of a breach of the trust relation between himself and his intermediary—a trust arising prior to the discount—and the paper has come into the hands of an honest purchaser ignorant of the fraud. Here the dis-

counting bank (payee) is as completely a holder in due course as if the paper had been payable to A, the intermediary, and he has indorsed it over to the payee. It was alone through the intervention of the intermediary that the bank acquired a title—and whether this were by indorsement or by delivery by him is not material to the inquiry whether there has been 'negotiation' to the payee. In either case the payee acquired the instrument from a third person standing between maker and payee. The substance of the transaction is not to be obscured by its form."

Counsel for the plaintiff bank quotes extensively in his brief from the notes in A. L. R. above referred to, wherein it appears that the annotator strongly favors the negative interpretation of the act, mainly on the ground that a holder for value or in due course, within the meaning of the act, is one to whom an instrument has been negotiated under certain conditions by one in whose hands it was an existing obligation. In the note in 21 A. L. R. page 1366, he says: "Negotiation of a bill or note is distinguished throughout the act from the issue thereof. It seems obvious that a payee cannot meet the conditions thus laid down in any case, for the simple reason that there is no one in whose hands the instrument can be an existing obligation prior to the person named as payee in the instrument itself, to transfer it to the payee." He, therefore, contends that the only proper construction to be placed upon section 30 of the act defining negotiation is, that it must be transferred in the manner prescribed by the second sentence of that section, and no other. The annotator then states that a fundamental error exists in both lines of decisions in the assumption that the right of the payee to recover under the circumstances involved in the cases necessarily depends upon his being a holder in due course within the meaning of the Negotiable Instruments Act, whereas, in practically all of the cases so holding, the payee was entitled to protection under the common law principle of estoppel, and it would make no difference, under those circumstances, whether the instrument was negotiable or non-negotiable,

especially as section 58 of the act (Code, section 5620) provides that, "In the hands of any holder other than a holder in due course, a negotiable instrument is subject to the same defenses as if it were non-negotiable."

It thus appears from the authorities that the whole question at issue depends, in the last analysis, upon whether or not the second sentence of section 30 (Code, section 5592), providing that an instrument, "If payable to bearer it is negotiated by delivery; if payable to order it is negotiated by the indorsement of the holder completed by delivery," provides the only method by which an instrument can be negotiated within the purport of subsection 4, section 52 of the act (Code, section 5614, subsec. 4), or whether delivery of the instrument to the payee by one who is not an ostensible party thereto and in whose hands it is not an existing obligation, constitutes a negotiation within the meaning of said act.

While we think it may be said that the proper construction to be put upon this section may still be regarded as at least debatable, and while we recognize the force of the reasoning advanced in favor of the negative view, we think the better opinion is with the affirmative view of the question in both reason and weight of authority. We, therefore, conclude that a payee who receives a completed negotiable instrument from the holder thereof, for value, before maturity, without notice of any infirmity, and in good faith, is a holder in due course within the purview of the Negotiable Instruments Law. We do not mean to say, however, that every payee can, or may be, a holder in due course, for although under section 59 of said act (Code, section 5621) every holder is deemed *prima facie* to be a holder in due course, when a payee takes a note direct from a maker this presumption is, of course, rebutted by proof of that fact.

The next question to be considered is whether the plaintiff bank, at the time it received the check in question, had notice of any irregularity in the issuance of the check, or defect in Hill's title thereto. To constitute notice of in-

firmity in the instrument the bank must have had actual knowledge of such infirmity, or knowledge of such facts that its action in taking the check amounted to bad faith. We find no evidence of bad faith on the part of the plaintiff bank in the instant case. As previously said, the check was regular and complete on its face, was not overdue and was signed by an officer authorized to issue drafts of the bank. When Mr. Hill took the check to Mr. Jones he told him that it was to pay his note, and that arrangements had been made with the American National Bank in Richmond to obtain the funds for the payment of the check. It is argued that the fact that Hill had previously given his check on the National Bank of Suffolk in payment of the note without having the money to his credit, and the defendant bank had requested the return of the money, put the plaintiff bank on inquiry in regard to the check in suit. We do not think that this is sufficient evidence to show knowledge on the part of Mr. Jones in taking the check. There might be more ground for this contention if the check had been drawn and signed by Mr. Hill, but, it having been signed by another duly authorized officer of the bank, and Mr. Hill still occupying the trusted and responsible position of cashier, Mr. Jones had every right to assume that Hill had made the arrangements detailed to him at the time with his own bank to take care of the check, and that its issuance was authorized and regular in every respect. In fact, while Hill had no authority to have this check issued for his own benefit, as he did, we do not think his conduct amounted to fraud. It appears from the evidence that before obtaining the check he had taken steps to procure the money at the American National Bank in Richmond, and the evidence tends to show that if payment had not been stopped by Mr. Woolford the money would have been placed to the bank's credit to meet the check. Payment having been stopped, however, the loan at the Richmond bank fell through. In this, Hill is corroborated by Mr. Durrette, cashier of the last named bank. In view of these facts and circumstances, we think the case is controlled on this point

by *Fleshman* v. *Bibb,* 118 Va. 582, 88 S. E. 64, 66, where it is said:

"In our view of the evidence, if the defendant in error can be said to have acted negligently, or to have been affected by suspicious circumstances in taking the notes, this is certainly the most that can be charged against him, and this, in the absence of proof of facts amounting to fraud on his part, is not sufficient to defeat his right of action." See, also, *City Nat. Bank* v. *Hundley,* 112 Va. 51, 70 S. E. 494; *Coopersmith* v. *Mahoney,* 150 Va. 685, 143 S. E. 313; 3 R. C. L. page 997.

. Counsel for the plaintiff in error relies on the case of *Chase & Co.* v. *Norfolk Nat. Bank,* 151 Va. 1040, 145 S. E. 725; *Culpeper Nat. Bank* v. *Tidewater Improvement Co.,* 119 Va. 73, 89 S. E. 118, and that line of cases holding that a corporation is not bound by the acts of one of its officers acting in his own behalf and against the interest of the corporation, without the knowledge of the corporation. We do not think, however, that these latter cases are applicable. In the *Chase Case,* the facts were entirely different. In that case Custis was authorized to draw on the accounts of his employer, Chase and Company, in the Norfolk bank and in a bank in Rocky Mount, North Carolina. The check was drawn upon the account of Chase and Company in the Rocky Mount bank, payable to the Norfolk bank. Custis took this check to the Norfolk bank and, after indorsing it, deposited it to his individual credit and then withdrew the funds. No question arose in that case as to the Negotiable Instruments Act, but the court held the bank liable to Chase and Company on the ground that the Norfolk bank indorsed the check in order to collect it and the check was on its face an order to the bank, the payee, to collect the amount from the Rocky Mount bank to be placed to the credit of Chase and Company in the Norfolk bank where Chase and Company kept its account; that it was not within the apparent scope of the authority of Custis to deposit the check to his own credit instead of the credit of the principal, and by complying with his request to do so, the bank partic-

ipated in his diversion of the funds belonging to the principal.

Upon careful consideration of the whole case, we are of opinion that the judgment of the lower court must be affirmed.

*Affirmed.*