# Richmond

PHILIP THOMAS DUDLEY, ET AL.

V.

ESTATE LIFE INSURANCE COMPANY OF AMERICA

August 30, 1979.

Record No. 771792.

Present: All the Justices.

*Tommy Joe Williams (James H. Fulghum; King, Fulghum, Renick & Bounds,* on briefs), for appellants.
*David B. Hart (Smeltzer & Hart, P.C.,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

In this civil appeal, we examine a principal's liability to third persons for fraudulent conduct of an agent.

Appellants Philip Thomas Dudley and Richard W. Walters filed separate actions at law in the court below seeking recovery in damages from appellee Estate Life Insurance Company of America and from George W. Blood. In identical amended motions for judgment, the respective plaintiffs alleged they were damaged by certain fraudulent, malicious and wanton acts of defendant Blood who was acting

in the Roanoke area as a representative and agent of defendant Estate Life. Specifically, plaintiffs alleged that during the period of time in question, Blood made certain misrepresentations which induced Dudley and Walters to purchase "one unit" of a special type of life insurance policy and to pay large sums of money upon Blood's promise that plaintiffs would each receive one-fourth of one percent of all insurance premiums collected from other sales of the special policy in Virginia and elsewhere. Plaintiffs alleged that the representations were in fact part of a scheme by which Blood defrauded them. They sought compensatory and punitive damages against both defendants. Estate Life denied involvement in any fraudulent acts or that it was responsible for any such conduct on the part of anyone, including Blood. Blood denied that he acted in a fraudulent or malicious manner.

The cases were consolidated for trial before a jury and, at the conclusion of plaintiffs' evidence in chief, the trial court sustained Estate Life's motion to strike and entered summary judgment in its favor in each case. Blood's motion to strike was overruled and, subsequently, a judgment was entered in favor of each plaintiff against Blood for compensatory damages only. We granted plaintiffs a writ of error to the September 1977 orders of summary judgment. Blood is not a party to this appeal and the validity of the judgments against him are not in issue here.

As we view the plaintiffs' evidence, drawing all reasonable inferences in their favor, the following story develops. The evidence consisted of documentary exhibits and the testimony of Dudley, Walters, Dudley's sister, the treasurer of Estate Life and the chairman of the insurer's board of directors.

At some unspecified time prior to the fall of 1972, the management of Estate Life, a life insurer with its home office in Roanoke, "brought" Blood to Roanoke to supervise the sale of a so-called "GP-800" policy. Although a specimen copy of the policy is not in the record on appeal, non-specific testimony showed that "one unit" of the GP-800 could be purchased by payment of a premium of $600 per year for a period of eight years. At the end of the period, the policy would be "paid up" and the insured would receive a "dividend" of $100 per month for life.

Blood was given the title "Director-Special Marketing" by Estate Life. This title appeared on Blood's Estate Life business cards as well as on publicity brochures and a full-page newspaper advertisement, both listing him among the company officers. Blood individually had a general agency contract with Estate Life. In addition, a corporation organized by Blood to carry on his general agency business, First

Estate Builders, Inc. (hereinafter First Builders), also held a general agent's contract with Estate Life. Blood was president of First Builders and told plaintiffs he had the exclusive right to sell, through First Builders as General Agent, all the GP-800 policies written by Estate Life.

Plaintiff Walters, a Roanoke tire salesman, first met Blood in December of 1972. Blood displayed his Estate Life business card, stated he represented the insurer, and asked Walters if he would "like to get into the insurance business on a part-time basis." Walters expressed interest and Blood outlined the requirements as follows. First, the prospect must purchase a GP-800 policy. Next, he must attend a "school" for insurance salesmen at a cost of $75. Upon completion of the training, the recruit would be a "Marketing Representative" of Estate Life entitled to a commission of 35 percent of the first year premiums on policies sold by him. The representative could advance to the position of "Marketing Director," entitled to a 55 percent commission, by selling ten GP-800 policies and by recruiting five other persons to be salesmen of the GP-800.

Blood also outlined an alternative method, to be covered by an "Addendum" to a written Marketing Director Contract, which would permit a representative to be promoted immediately to Marketing Director. By the payment to First Builders of $10,000 in cash, the prospect would be designated a Marketing Director and also become entitled to one-fourth of one percent of all the premiums on GP-800 policies sold by Estate Life through First Builders. Blood advised Walters that within six years, Walters could earn $62,500 annually in commissions, emphasizing that Blood, through First Builders, owned all of the commissions earned on the GP-800.

Walters purchased the policy, paid the additional $75, and attended a three-hour "school" conducted, in part, by Blood at a local motel. Walters subsequently received a six-month temporary license to sell insurance for Estate Life. During February of 1973, Walters attended several "sales meetings" in Roanoke at which the president and another officer of Estate Life as well as Blood all spoke emphasizing the need to promote the GP-800 policy.

In February, Walters introduced Blood to plaintiff Dudley, who operated a country store in Bedford County. Blood made the same presentation to Dudley as he had made to Walters. Dudley, at first, was skeptical about accepting Blood's representations concerning the bonanza to be secured by the Addendum Contract. Blood assured Dudley that the president of Estate Life would execute both the Marketing Director Contract and the Addendum. Thereupon, after

prodding by Blood over a period of several weeks, Dudley finally agreed to Blood's proposal and in March of 1973 handed Blood a check for $10,000 payable to First Builders. At the same time, Dudley executed two three-party documents, the printed "Marketing Director Contract" and "Addendum to Marketing Director Contract." These papers had already been signed on behalf of Estate Life by its president and by Blood as president of First Builders. These documents, introduced as exhibits at trial, provided for commissions to be paid on essentially the basis described by Blood to plaintiffs. They made no reference, however, to any requirement for the payment of $10,000 in order for the salesman to be eligible to receive the commissions described in the "Addendum."

Upon being told by Blood that Dudley had "signed up," Walters agreed to become a Marketing Director and to take advantage of the commissions set forth in the Addendum. Based on what Blood told him, Walters thought he was "buying into [Estate Life]" and would receive "one-quarter of 1% of all the GP 800 that were sold in Estate Life by all of the agents of Estate Life." Thus, in March of 1973, Walters gave Blood a note for $8,000 and paid the balance of $2,000 by check made to First Builders.

In April, Dudley received a telephone call from Blood. According to Dudley, Blood "talked real excited" and "was real upset." Blood told Dudley that Blood no longer had the exclusive agency for sale of all the GP-800 policies and that Estate Life had "divided" the right to sell the policy among as many as seven other general agents. Dudley testified he then realized that he and Walters had "been took." Dudley, to that time in April, had received about $15 in commissions paid by checks drawn by Estate Life. Blood disappeared from Roanoke. Plaintiffs' subsequent efforts to recover their cash payments from Blood and Estate Life were fruitless.

■ At the threshold, the parties disagree upon the issue on appeal. Plaintiffs claim that the only question is whether Blood acted within the apparent scope of his authority as agent. They point out that Estate Life assigned two basic grounds in support of its motion to strike plaintiffs' evidence: first, that the evidence failed to establish that Blood was clothed with authority to act as an agent for Estate Life under the circumstances and, second, that the evidence failed to show that Blood made fraudulent misrepresentations of existing facts. Plaintiffs also note that Blood moved to strike the evidence on the sole ground that Blood individually was not guilty of fraud because First Builders, and not Blood, received the money paid by plaintiffs, and because plaintiffs entered into the speculative venture "with their eyes wide

open." Consequently, plaintiffs argue, when the trial judge, who assigned no reasons for his rulings on the respective motions to strike, overruled Blood's motion, the court implicitly ruled that a prima facie case of fraud and deceit had been established. Thus, plaintiffs argue the court below must have ruled in Estate Life's favor solely upon the apparent authority issue; they have appealed the trial court's decision on that one question, plaintiffs contend.

Estate Life argues, however, that both the issue of fraud and the issue of apparent authority properly are questions on appeal. Estate Life contends that because the trial judge failed to assign any reasons for his rulings on the motions to strike, it must be assumed that he agreed with each position taken by Estate Life in support of its motion, thereby making the fraud issue a proper subject for determination here. We disagree.

The cases went to the jury as to Blood on the theory of fraud and deceit. We will not presume that the trial judge made inconsistent rulings on the fraud question when he considered the separate motions to strike. So it is manifest that the court ruled in Estate Life's favor, and, of course, against plaintiffs, solely on the apparent authority question. As a consequence of this adverse ruling in their claims against Estate Life, the plaintiffs assigned one error as follows:

The trial court erred when it sustained the motion to strike of Estate Life Insurance Company of America at the conclusion of plaintiffs' case on the grounds there was no evidence at all upon which to find the defendant Blood acted within the scope of his authority so as to make Estate Life Insurance Company of America, his principal, liable for the perpetrated fraud.

That assignment of error raised the sole issue of apparent authority.* Elementary is the rule of appellate procedure that the scope of argument on appeal is limited by the assignments of error. *Harlow* v. *Commonwealth,* 195 Va. 269, 271, 77 S.E.2d 851, 853 (1953). Consequently, we hold that the only issue open to debate in this appeal is whether the plaintiffs' evidence established prima facie that Blood acted within the apparent scope of his authority thereby making Estate Life liable for the alleged fraud.

■ On that issue, Estate Life argues that the evidence demonstrates

---

* The assignment of error contained in the petition for appeal was in the foregoing language. That original language was altered when the assignment was set forth in the appendix and plaintiffs' opening brief, but presented the same issue. Such an alteration is contrary to accepted practice and is improper.

the fraud was committed solely for Blood's personal gain. Thus, it contends, the fraud was committed outside the scope of the agent's authority and the principal is not liable. In the same vein, the insurer takes the position that in a case such as this in which the agent makes fraudulent misrepresentations to procure personal gain, the principal cannot be held liable for those misrepresentations absent proof of actual knowledge. We reject these contentions and hold that the plaintiffs proved a prima facie case of liability upon Estate Life.

We are guided in our decision by the following Restatement rules, which are in accord with principles already established in Virginia:

### Agent's Position Enables Him to Deceive

A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud.

*Restatement (Second) of Agency* § 261. Comment a. to § 261 reads as follows:

> The principal is subject to liability under the rule stated in this Section although he is entirely innocent, has received no benefit from the transaction, and, as stated in Section 262, although the agent acted solely for his own purposes. Liability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him.

Section 262 of the same Restatement provides:

### Agent Acts for His Own Purposes

A person who otherwise would be liable to another for the misrepresentations of one apparently acting for him is not relieved from liability by the fact that the servant or other agent acts entirely for his own purposes, unless the other has notice of this.

The Comment gives the following rationale for the rule set forth in § 262.

> A person relying upon the appearance of agency knows that the apparent agent is not authorized to act except for the benefit of the

principal. This is something, however, which he normally cannot ascertain and something, therefore, for which it is rational to require the principal, rather than the other party, to bear the risk. The underlying principle based upon business expediency—the desire that third persons should be given reasonable protection in dealing with agents [—] finds expression in many rules, some in situations in which there is no apparent authority. . . and many in situations in which there is apparent authority. . . . In all of such cases the other party relies upon the honesty of the agent, and, if the principal is disclosed or partially disclosed, realizes that the agent is not authorized if fraudulent. It is, however, for the ultimate interest of persons employing agents, as well as for the benefit of the public, that persons dealing with agents should be able to rely upon apparently true statements by agents who are purporting to act and are apparently acting in the interests of the principal.

*Restatement (Second) of Agency* § 262, Comment a.

The foregoing principles were applied in *Jefferson Standard Life Insurance Co.* v. *Hedrick,* 181 Va. 824, 27 S.E.2d 198 (1943). There, the wilful and culpable deception by the agent, authorized by his employer, an insurer, to solicit loans for the company, induced the plaintiff not to seek a loan elsewhere resulting in damage to plaintiff for which he sued the principal. This court in affirming a judgment against the insurer, held that a principal is liable for the fraudulent and deceitful acts of his agent "committed as an incident to and during the performance of an act which is within the scope of the agent's authority." 181 Va. at 834-35, 27 S.E.2d at 202.

Review of several foreign cases will demonstrate the manner in which courts of other jurisdictions have applied the foregoing principles. In *Bowman* v. *Home Life Insurance Company,* 243 F.2d 331 (3d Cir. 1957), a male field underwriter for defendant life insurer, masquerading as the company's physician, conducted intimate physical examinations upon the female plaintiffs, who had applied for insurance. The insurer furnished the underwriter with the plaintiffs' original application cards, which entitled him to ask plaintiffs many questions. He was to determine whether the insurance applied for was an appropriate risk for the company to assume. The underwriter was not a physician and he was not authorized to conduct physical examinations. He obtained a black bag, which looked like a physician's kit, called upon the plaintiffs at their home and made the examinations. Applying Pennsylvania law and the foregoing Restatement rules, the Third Circuit determined, in the plaintiffs' suit for damages against

the insurer, that the underwriter's conduct could be attributed to his employer. The court noted that even though the agent went further than his instructions and committed a tort upon the plaintiffs, "this was a kind of deceit which was well within the insignia of office with which he had been clothed." 243 F.2d at 334.

Likewise, in *Lucas* v. *Liggett & Myers Tobacco Co.,* 50 Haw. 477, 442 P.2d 460 (1968), the owners of a supermarket sued a cigarette manufacturer for the value of cigarettes stolen by a cirgarette sales representative. The evidence showed that in the course of servicing a large cigarette rack in the supermarket, the manufacturer's agent had stolen a quantity of the product over a period of time. The stolen cigarettes had been billed to the supermarket by the wholesale supplier, to which the supermarket owners had made payment. The Supreme Court of Hawaii rejected Liggett & Myers' argument that it was not liable because the agent was acting outside the scope of his employment when he committed the thefts. Relying on the foregoing Restatement rules, the court held the principal liable for the acts of its agent. It pointed out that Liggett & Myers put the agent in a position to commit the thefts and that from the plaintiff's point of view all of the agent's activities in connection with servicing the cigarette rack were apparently authorized by the principal. The court emphasized that Liggett & Myers' division manager frequently accompanied the agent and gave no indication that he disapproved of the agent's servicing activities at the supermarket.

The same reasoning has been uniformly applied in other cases with facts similar to *Lucas*. *E.g., Billups Petroleum Co.* v. *Hardin's Bakeries Corp.,* 217 Miss. 24, 63 So.2d 543 (1953); *Ripon Knitting Works* v. *Railway Express Agency,* 207 Wis. 452, 240 N.W. 840 (1932).

Applying the foregoing principles to these facts, we think plaintiffs' evidence was sufficient to raise a jury issue on the question whether Blood's conduct was attributable to his principal. Estate Life put Blood in a position which enabled him, while apparently acting within his authority, to perpetrate the frauds upon Dudley and Walters. And on this evidence, we cannot say as a matter of law that plaintiffs had notice that Blood was acting for his own purposes.

From a third person's point of view, Blood was clothed with all the authority of Estate Life necessary to sell its product and to recruit others to become salesmen for the insurer. The principal armed Blood with an Estate Life business card which he used during his solicitation of plaintiffs. Blood was prominently presented in company brochures and in a newspaper advertisement as one of the insurer's officers. He advocated promotion of the GP-800 in sales meetings in the presence

of other company officers, who, according to the evidence, never registered any disapproval of Blood's sales activities. He was allowed to display written contracts specifying compensation for salesmen which carried the signature of the president of Estate Life as one of the contracting parties.

Blood's position, thus ornamented, facilitated the consummation of the fraud whereby he improperly extracted a total of $12,000 from the two plaintiffs. Under the circumstances, Dudley and Walters were entitled to rely on statements made by Blood, who was purporting to act and was apparently acting in the interests of Estate Life.

Finally, Estate Life relies on the cases of *Bank of Occoquan* v. *Davis,* 155 Va. 642, 156 S.E. 367 (1931), and *Peoples National Bank* v. *Morris,* 152 Va. 814, 148 S.E. 828 (1929), neither of which is apposite and each of which is factually dissimilar. In *Bank of Occoquan,* the defendant bank was held not liable for the fraudulent acts of one of its agents, a cashier. The dispositive holding was that the plaintiff had actually constituted the cashier as his own agent. Thus, the plaintiff, and not the bank, was bound by the agent's fraudulent conduct. Here, Blood was not plaintiffs' agent.

In *Peoples National Bank,* one Davis was cashier of the predecessor to defendant bank and was also president of a mercantile company. On behalf of the mercantile company, Davis obtained advance payments of rent from the plaintiff Morris, lessee of a building owned by such company. This was done a few days before the bank foreclosed on the rental property, thus eradicating the lease. Davis paid the money obtained from the plaintiff to the mercantile company which, in turn, used it to pay a debt to the bank. The evidence showed that Davis acted for his own benefit solely in his capacity as president of the mercantile company. In that capacity, he made no representations on behalf of the bank. Accordingly, this court refused to hold the bank liable for the conduct of Davis "merely" because he happened to be cashier of the bank. 152 Va. at 823, 148 S.E. at 830. In the case under consideration, however, Blood was acting for himself and First Builders, but such conduct of Blood individually and on behalf of his own corporation was apparently within the scope of Estate Life's business of vending insurance and recruiting salesmen.

In passing, we note broad language in *Peoples National Bank,* 152 Va. at 823-24, 148 S.E. at 830, a portion of which is quoted in *Bank of Occoquan,* 155 Va. at 648, 156 S.E. at 368, which states that when an agent, ostensibly acting in the principal's business, is really committing a fraud for his own benefit, he is acting outside the scope of his agency and the principal is not liable for such conduct.

To the extent that this language means that when an agent is acting fraudulently for his own benefit, *ipso facto* he is acting outside the scope of his authority, we expressly disapprove it as being at odds with the views we have expressed in this opinion.

For the foregoing reasons, we hold that the trial court erred in sustaining Estate Life's motion to strike the plaintiffs' evidence. Consequently, the judgments below will be reversed and the cases remanded for new trials.

*Reversed and remanded.*